**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KEITH HOWARD, et al.,

Plaintiffs,

v.                                                    Case No. 1:19-cv-00570

POST FOODS, LLC,                                      HON. Hala Y. Jarbou

Defendant.                                            ORAL ARGUMENT REQUESTED

---

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY**
**JUDGMENT ON LIABILITY**
**AND REQUEST FOR ORAL ARGUMENT**

## TABLE OF CONTENTS

TABLE OF AUHTORITIES ....................................................... iii

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ................................... v

CONCISE STATEMENT OF ISSUES PRESENTED ................................ vi

I.    INTRODUCTION ...................................................**Error! Bookmark not defined.**

II.   STATEMENT OF FACTS ................................................................1

III.  THE STANDARD APPLICABLE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ............................................................8

IV.  THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO LIABILITY ON PLAINTIFFS' FIRST CAUSE OF ACTION FOR DEFENDANT'S FAILURE TO COMPENSATE FOR OVERTIME HOURS WORKED IN VIOLATION OF THE FLSA ......9

   A.    Plaintiffs' and Opt-In Plaintiffs' Time Spent Washing Hands and Sanitizing in Building 14 is not Excluded from Compensability by 29 U.S.C. §203(o) and The CBA as Time Spent "Changing Clothes"..................................................................9

   B.    Plaintiffs' and Opt-In Plaintiffs' Time Spent on COVID Screening and Off-the-Clock CUP Tasks is Compensable, and not Excluded by the Portal-to-Portal Act ...........................14

     1)   The Portal-to-Portal Act and Continuous Workday Rule ...............................14

     2)   Plaintiffs' and Opt-In Plaintiffs' Principal Activity is the Production of Uncontaminated Cereal .....................................................................16

     3)   COVID Screening is Integral and Indispensable to Plaintiffs and Opt-In Plaintiffs' Principal Activity ................................................................17

     4)   Donning and Doffing Uniforms and Dedicated Shoes is Integral and Indispensable to Plaintiffs' and Opt-In Plaintiffs' Principal Activity .................................................26

V.   CONCLUSION ...................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270 (10th Cir. 2020)...............................20, 21, 25

*Amini v. Oberlin Coll.*, 440 F.3d 350 (6th Cir. 2006)........................................................................8

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ........................................................14

*Arnold v. Schreiber Foods, Inc.*, 690 F. Supp. 2d 672 (M.D. Tenn. 2010) ...........................25, 29

*Castaneda v. JBS USA, LLC*, 819 F.3d 1237 (10th Cir. 2016)......................................................12

*Daniels v. Woodside*, 396 F.3d 730 (6th Cir. 2005) .................................................................8, 9

*De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361 (3d Cir. 2007)....................................................25

*Duncan-Watts v. Nestle USA, Inc.*, No. 1:19-cv-1437, 2020 U.S. Dist. LEXIS 18647 (N.D. Ohio
    Feb. 5, 2020)..................................................................................................................29

*Franklin v. Kellogg*, 619 F.3d 604 (6th Cir. 2010) ....................................................17, 26, 27, 28

*Gatewood v. Koch Foods of Miss., LLC*, 569 F. Supp. 2d 687 (S.D. Miss. 2008) .......................23

*Harwell-Payne v. Cudahy Place Senior Living LLC*, No. 2021-cv-328-PP, Dkt. No. 89 (Dec. 7,
    2021 E.D. Wis.)..............................................................................................................20

*Hoyt v. Ellsworth Coop. Creamery*, 579 F. Supp. 2d 1132 (W.D. Wis. 2008)............................13

*IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005) ............................................................................... passim

*Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27 (2014)............................................... passim

*Johnson v. Koch Foods, Inc.*, 670 F. Supp. 2d 657 (E.D. Tenn. 2009) .........................................29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)......................................8

*McDonald v. Kellogg Co.*, 2011 U.S. Dist. LEXIS 143084 (D. Kan. Dec. 13, 2011)..................29

*Minadeo v. ICI Paints*, 398 F.3d 751 (6th Cir. 2005).....................................................................8

*Mitchell v. King Packing Co.*, 350 U.S. 260 (1956) .....................................................................30

*Pack v. Damon Corp.*, 434 F.3d 810 (6th Cir. 2006).......................................................................8

*Perez v. Mountaire Farms, Inc.*, 650 F.3d 350 (4th Cir. 2011) ...................................................29

*Russano v. Premier Aerial & Fleet Inspections, LLC*, 2016 U.S. Dist. LEXIS 102313 (E.D.
    Mich. Aug. 4, 2016) .......................................................................................................25

*Salazar v. Butterball, LLC*, 644 F.3d 1130 (10th Cir. 2011) .......................................................29

*Sandifer v. US Steel*, 571 U.S. 220 (2014)............................................................................ passim

*Sandifer v. United States Steel Corp.*, 678 F.3d 590 (7th Cir. 2012)...........................................11

*Scalia v. AWP, Inc.*, 2020 U.S. Dist. LEXIS 241258 (W.D. Mich. Dec. 23, 2020) ...................25

*Steiner v. Mitchell*, 350 U.S. 247 (1956) ........................................................................ passim

*Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944) .......................14

*UFCW Local 1473 v. Hormel Foods*, 367 Wis. 2d 131 (Wis. 2016)......................................17, 22

*Whaley v. Henry Ford Health Sys.*, 172 F. Supp. 3d 994 (E.D. Mich. 2016)................................9

## STATUTES, REGULATIONS, AND FEDERAL RULES

29 U.S.C. § 203(o) ......................................................................................................... passim

29 U.S.C. § 207(a) ............................................................................................................1, 9

29 U.S.C. § 216(b) ............................................................................................................1, 9

29 U.S.C. § 254(a) ..........................................................................................................14, 15

29 C.F.R. § 785.12 ...............................................................................................................16

29 C.F.R. §785.43 .................................................................................................................20

29 C.F.R. § 790.6 ......................................................................................................16, 24, 25

Fed. R. Civ. P. 30..............................................................................................................2, 3, 4

Fed. R. Civ. P. 56....................................................................................................................8

## **CONTROLLING OR MOST APPROPRIATE AUTHORITIES**

*IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005)

*Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27 (2014)

*Sandifer v. US Steel,* 571 U.S. 220 (2014)

*Franklin v. Kellogg,* 619 F.3d 604 (6th Cir. 2010)

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

**Question**: Is Plaintiffs' time spent washing hands and sanitizing in Building 14 excluded from compensability by 29 U.S.C. §203(o) and the CBA as time spent "changing clothes?"

    **Answer**: No.

**Question**: Is Plaintiffs' time spent on COVID screening and Off-The-Clock CUP Tasks compensable?

    **Answer**: Yes.

**Question**: Is all time Plaintiffs spend after their first principal activity (either COVID screening or donning dedicated shoes and uniforms) and before their last principal activity (placing dirty uniforms in clothes bins post-donning) compensable pursuant to the continuous workday rule under the FLSA?

    **Answer**: Yes.

## I.      INTRODUCTION

Plaintiffs Keith Howard, Archie Smith, Stephanie Banks, Kevin Jackson, Jerry Panczyk, Marianne Heikkila, Terry Greenfield, and Autumn Tendziegloski ("Plaintiffs") bring this Motion for Partial Summary Judgment on Liability against Defendant Post Foods, LLC ("Defendant") for the sole remaining cause of action in the Complaint, as circumscribed and described below. Specifically, Plaintiffs contend that there is no genuine dispute as to any material fact as to the claim that Defendant failed to compensate Plaintiffs and Opt-In Plaintiffs[1] for overtime hours worked based on off-the-clock time associated with donning and doffing, waiting in line to wash and sanitize, sanitizing, washing their hands, and walking to and from workstations in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §207(a) *et seq*. In addition, Plaintiffs contend that Partial Summary Judgment should be granted for time spent pre-shift on COVID-19 temperature checks, screenings, and questionnaires, and the walking time to their workstations, also in violation of the FLSA.

As there is no genuine dispute as to any material fact underlying the sole cause of action, this matter is ripe for judgment on liability where the Court can adjudicate the legal significance of undisputed facts. As discussed below, Defendant failed to compensate Plaintiffs and Opt-In Plaintiffs for off-the-clock overtime hours worked, thus warranting partial summary judgment on liability as a matter of law on their overtime cause of action.

## II.      STATEMENT OF FACTS

Plaintiffs have all been employed or were employed by Defendant during the relevant time period (i.e., between May 2019 through the present) as non-exempt, hourly-paid employees

---

[1] "Opt-In Plaintiffs" refers to the approximate 430 Post employees who between July 13, 2021 and January 11, 2022 filed individual Consents to Join FLSA Action as a Party Plaintiff pursuant to 29 U.S.C. § 216(b). This Motion is brought on behalf of the named Plaintiffs and all other current and former production employees among the Opt-In Plaintiffs. The vast majority of the Opt-In Plaintiffs are current or former production employees.

in Defendant's cereal manufacturing plant in Battle Creek, Michigan. See Defendant's Answer to First Amended Complaint, ECF No. 34, at pp. 3-4 (admitting that Defendant employed the Plaintiffs during the relevant time period, and that it regularly employs hundreds of workers in its Battle Creek plant). At all relevant times, Local Union #374 of the United Cereal, Bakery, and Food Workers of the Retail, Wholesale & Department Store Union, UFCW (hereinafter, the "Union") has represented Plaintiffs and the Opt-In Plaintiffs, all of whom work or worked at Defendant's cereal manufacturing plant in Battle Creek, Michigan. *Id.* at p. 4 (admitting that the Union represents employees who are part of a bargaining unit at Defendant's plant in Battle Creek, Michigan, and that Defendant entered into a collective bargaining agreement with the Union effective October 5, 2015 to October 4, 2020).

Defendant and the Union entered into a collective bargaining agreement for the period from October 5, 2015 through October 4, 2020 (hereinafter, the "CBA"), as well as a 2020 CBA, which governed Plaintiffs and the Opt-In Plaintiffs' compensation and pay. See ECF No. 26-1; see also CJA Decl., **Exhibit A**, Rule 30(b)(6) Deposition of Caitlin Clancy (hereinafter "Clancy Depo."), 67:1-10, 84:14-85:14. Since at least May 2019, Article 44 of the CBA, which mirrors the statutory overtime requirements of the FLSA, but adds a daily overtime component for most workers, entitles all employees (except new-hire "associates") to time and one-half as compensation for all working time in excess of eight hours in any workday or for weekly hours worked in excess of 40 straight time hours (new-hire "associates" are eligible for weekly overtime, but not daily overtime). *Id.* 85:15-87:22. At all relevant times from May 2019 to the present, Plaintiffs and Opt-In Plaintiffs have been regularly scheduled to work and in fact worked forty hour scheduled workweeks, excluding any scheduled overtime hours. *Id.* 87:23-

88:23 (testifying that the regular or normal weekly schedule for full-time Union employees under the CBA was 40 hours).

Beginning on May 28, 2019, Defendant fully implemented changes to its uniform policy through a new policy known as the Battle Creek Food Safety Procedures GMP Entry and Exit Procedure (hereinafter the "Captive Uniform Policy" or "CUP"). CJA Decl., **Exhibit B**, Rule 30(b)(6) Deposition of Liane Ford (hereinafter "Ford Depo."), 4:24-5:8, 6:16-7:11, 8:13-22; ECF No. 26-2. The CUP is applicable to all employees working in production at Defendant's Battle Creek facility, and it was rolled out[2] to "describe the procedure that [Post was] to train on with the implementation of the hard shoe change and the GMP transition area[,]" and its purpose is to decrease or diminish contaminants within the production areas of the plant. Ford Depo., 7:16-20, 8:13-22, 9:22-25; ECF No. 26-2 (the CUP), PageID.122 ("The purpose of the Battle Creek GMP Entrance and its procedures is to break the outside from the inside of the plant, in order to prevent the transfer of microbiological contaminants into the facility, through potentially contaminated footwear and outer clothing. . . ."); Clancy Depo., 76:13-77:3 (testifying in her personal capacity that the "Off-The-Clock Tasks" required by the CUP do not eliminate, but they reduce the risk of contamination of cereal).

Since the adoption of the CUP, Defendant has required all of its employees working in production at Defendant's Battle Creek facility to abide by the following CUP procedures: proceed through a turnstile on the first floor of Building 8, hang up outside clothing, and place shoes on a shoe rack (Ford Depo., 8:23-9:21); once employees put their dedicated shoes on, they proceed to the uniform area across the walkway to grab uniforms, and proceed to the locker

---

[2] Prior to the CUP, Defendant's employees could change into their uniforms and shoes at home or at work, and they were not captive to the Battle Creek facility like its employees have been since the CUP's implementation. Ford Depo., 7:21-8:12.

room and change into uniforms (*Id.* 10:1-24); proceed to the hand wash and footwear sanitizing area in Building 14, where employees wash their hands and sanitize the bottom of their shoes, lunch containers, bump caps, backpacks, purses, and any other personal items they are bringing into the production area (*Id.* 11:8-13:4); employees also pick up their hair nets and earplugs in Building 14, which they must put on before entering the production buildings (*Id.* 12:4-8, 13:5-13);[3] production employees then walk to one of the four Post production buildings where they are assigned to work—Building 4, 29, 20/32, or 17—by following one of two walkway routes from Building 14 (*Id.* 14:13-15:11);[4] production employees are also required to leave any lunchboxes in a break room before going to their work location, and they then must re-wash their hands and re-sanitize their shoes again when they leave the break room, so employees with lunchboxes must go through multiple hand washings and must sanitize their shoes multiple times before they get to their assigned production areas (Ford Depo., 15:25-16:19).

Defendant's timeclocks are located in the production buildings where production employees work, and Defendant's corporate designee testified that since May 2019, all of the aforementioned CUP procedures and walking time is done <u>before</u> the production employees actually clock in after reaching the production building where they will be working. *Id.* 15:12-24. After their scheduled shift times end, production employees clock out at the particular time clock within the building where they are working. *Id.* 16:20-24. Since at least May 2019, production workers have been required to place their dirty uniforms in dirty clothes bins located around the

---

[3] From at least May 2019 to the present, every Post employee in production has been required to wear a hairnet and earplugs, and they all have to do the sanitizing and washing before going into the production building. *Id.* 13:18-14:12.

[4] Defendant's corporate designee, Mr. Aaron Hakman, testified that from May 2019 to the present, there are four main routes that are taken by production workers who work in the "GMP" production areas (i.e., the GMP area is anywhere that is within food contact that requires specific limitations on how the employees maintain their uniforms and practices pursuant to the CUP) to get from the entrance of Building 8, to the hand wash and footwear sanitizing area in Building 14, and then to their particular work locations. CJA Decl., **Exhibit C**, Rule 30(b)(6) Deposition of Aaron Hakman (hereinafter "Hakman Depo."), 11:23-12:16, 14:14-16:8.

corner from Building 8 (the facility entrance) after they clock out and after the scheduled end of their shifts and after they walk back to the locker rooms and change out of their clothes. *Id.* 17:4-18:3.[5] The CUP procedures and policies[6] were required for all of the Battle Creek employees who were going into a production facility since its implementation. *Id.* 21:13-20.

At all relevant times since May 2019, Defendant has not compensated  its workers for their time spent on any of the following off-the-clock activities, all of which Defendant treats as non-compensable time: (a) spending time waiting in line to wash hands or sanitize; (b) sanitizing; (c) washing hands; (d) donning and doffing earplugs[7] and hairnets; (e) walking from locker rooms or sanitizing stations to workstations post-donning, and before clocking in; and (f) walking from workstations after clocking out to deposit uniforms and/or other items into receptacles and clothes bins (the aforementioned tasks (a) through (f) are hereinafter referred to collectively as "Off-The-Clock CUP Tasks"). Clancy Depo., 69:5-71:25, 73:9-15, 91:3-16.

Defendant has also not kept any contemporaneous timekeeping system to track the time spent by its production employees on Off-The-Clock CUP Tasks. *Id.* 72:1-73:8. In fact, since at least May 2019, regardless of their actual clock-in and clock-out times, Plaintiffs and Opt-In Plaintiffs are paid for their scheduled shift time—including any scheduled overtime—and Defendant does not pay to the minute based on when Plaintiffs and Opt-In Plaintiffs clock in and clock out. *Id.* 81:5-82:24, 90:18-91:2 (Defendant "presumes that the actual work time of each employee, unless somehow it's discovered otherwise, is [scheduled shift] time").[8] Similarly,

---

[5] All of the aforementioned CUP procedures also apply for any employees who leave the facility during breaks, i.e., employees who put on their street shoes and clothes and leave the facility for breaks must go through all of the CUP procedures again upon their return to the facility. *Id.* 18:25-19:4.

[6] While Defendant implemented a revised CUP on July 11, 2019 which replaced the May 28, 2019 CUP, Defendant's corporate designee could not identify anything that was materially different between the two CUP policies. *Id.* 20:4-21:12. *Compare* ECF No. 26-2 (the CUP) *with* CJA Decl., **Exhibit D** (the July 11, 2019 CUP).

[7] Defendant's corporate designee, Ms. Clancy, testified that rather than qualifying earplugs as clothing, she qualifies them as personal protective equipment. Clancy Depo., 74:10-19

[8] Defendant relies on the clock-in and clock-out times to know who punched in and worked their shifts to confirm

5

from at least May 2019 to present, Defendant has not kept any timeclock records as to how long employees spend for meal or rest breaks. *Id.* 97:4-7.

Beginning on April 23, 2020, Defendant launched its pre-shift COVID-19 wellness screening program, which applied to all employees, contractors, and anyone entering the Battle Creek facility (hereinafter referred to as "COVID screening"). Clancy Depo., 13:24-15:15; CJA Decl., **Exhibit E** (the April 22, 2020 Memo to all Battle Creek Employees Regarding COVID Screening Program). Defendant's COVID screening consists of a daily symptom checker for COVID-19, a questionnaire, as well as a temperature check before each shift, and Defendant requires COVID screening for all employees every single workday. *Id.* While Defendant has contracted with different third parties to assist with COVID screening since April 2020 (*Id.* 16:23-17:18, 25:12-27:5, 27:24-28:2, 35:6-36:3, 42:9-43:8, 47:25-48:16), Defendant's employees have been required to go through COVID screening before they begin each shift since April 2020, which includes self-assessments, the completion of a questionnaire, and a temperature check. *Id.* 17:6-18, 22:7-24, 31:6-33:2, 36:4-37:3, 37:8-38:2, 38:13-41:2, 57:20-58:2. Beginning in August 2020, Defendant expected its Battle Creek employees to complete the COVID screening questionnaire portion via an online web portal—which most employees could do on their own cell phones via a "Buoy system"—but Defendant also maintained a computer kiosk at two entrances that employees could use for the questionnaire if they did not have a smart phone or computer. *Id.* 37:8-41:1.

The stated purpose of the Post COVID Screening Program is "to keep employees safe during the COVID pandemic," and it was both required by State law and necessary to promote

---

they should be paid for their shift time, but the function of the timeclock is just to confirm employees were at their work station at their scheduled shift time. *Id.* If an employee arrives to their post 10-minutes early and clocks in, for example, Post does not pay them for an extra 10-minutes of work; rather, they are only paid beginning at the start of their shift time. *Id.* 83:5-21.

safety from COVID-19 and the wellness of Defendant's employees while they were working during the pandemic. *Id.* 19:24-20:15, 22:1-6; CJA Decl., **Exhibit F** (the April 22, 2020 Talking Points for Optum Work Well Program), p. 1.[9] Defendant's managers were provided with talking points regarding the COVID screening program around April of 2020, including being advised that if they were asked, they should tell employees to allow themselves 10 extra minutes before their scheduled shift for the screening process. Clancy Depo., 24:4-25:6; CJA Decl., **Exhibit F**, p. 1; *see also* CJA Decl., **Exhibit G** (the April 22, 2020 Battle Creek COVID-19 Screening Process); Clancy Depo., 29:9-33:2 (testifying that Defendant posted a COVID-19 screening process document in the plant entryway in April 2020, that it was posted for Battle Creek employees to review, understand, and comply with the COVID-19 screening process, that the document instructs employees to "give yourself at least 10 minutes prior to your scheduled shift to get through screening process[,]" and that employees were expected to complete COVID screening before their shift's starting time, and that they could be disciplined if they did not complete the screening).[10]

Defendant has not compensated any of its employees at the Battle Creek facility for the time they spent completing any COVID screening tasks—including pre-shift self-assessments, questionnaires, temperature checks, or waiting in line to complete any of those tasks—from

---

[9] It is also a collateral and not insignificant benefit that potential COVID-19 contaminated droplets do not get into the cereal itself, if and when workers with COVID-19 were to sneeze or cough around the production line. In China, two COVID-19 outbreaks were linked to food contaminated COVID: "Food transmission evidence has been disclosed in China early July 2020 by the detection of SARS-CoV-2 on frozen foods, including their packaging materials and storage environments, with two re-emergent outbreaks linked to contaminated food sources." *See* Han et al., *Can the coronavirus disease be transmitted from food? A review of evidence, risks, policies and knowledge gaps*, National Center for Biotechnology Information (Oct. 1, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7529092/ (That foodborne transmission of COVID-19 may present a systematic risk "is plausible given that food contamination may occur via respiratory droplets, contact or other route, during the farming, processing, storage, transport, and retailing process where foods may contact with different workers and ambient environments in the 'farm-to-table' lifecycle.").
[10] Mr. Hakman also testified in his personal capacity that he was aware the company told employees to set aside at least 10 minutes to fulfill COVID screening tasks. Hakman Depo., 23:6-14.

April 2020 onward. Clancy Depo., 18:18-23, 64:3-9. Moreover, Defendant informed its employees that they would be disciplined if they did not do the COVID screenings, and in fact did discipline employees on more than one occasion for not complying with COVID screening requirements. *Id.* 31:6-33:2, 53:17-54:11, 56:20-25, 62:16-64:2.

### III.    THE STANDARD APPLICABLE TO PLAINTIFFS' MOTION FOR SUMMMARY JUDGMENT

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). No genuine issue of material fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin Coll.*, 440 F.3d 350, 357 (6th Cir. 2006).

While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734–35 (6th Cir. 2005). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813–14 (6th Cir. 2006). In sum,

8

summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

## IV.   THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO LIABILITY ON PLAINTIFFS' FIRST CAUSE OF ACTION FOR DEFENDANT'S FAILURE TO COMPENSATE FOR OVERTIME HOURS WORKED IN VIOLATION OF THE FLSA

The FLSA obligates employers to compensate employees for each hour worked in excess of 40 per week at a rate of 1.5 times the employees' regular wages. 29 U.S.C. §207(a); *see also Whaley v. Henry Ford Health Sys.*, 172 F. Supp. 3d 994, 1001 (E.D. Mich. 2016) (providing the legal elements of an FLSA overtime claim, which include: "(1) an employer-employee relationship, (2) that the employees are covered, (3) the employees worked more than forty hours, and (4) that overtime was not paid."). If an employer covered by the FLSA fails to comply with FLSA overtime requirements, it is liable to the affected employees in the amount of overtime compensation owed and an additional, equal amount as liquidated damages, plus attorneys' fees and costs. *Id.*; *see also* 29 U.S.C. §216(b).

Since April 2019, Plaintiffs and Opt-In Plaintiffs have been employed by Defendant in non-exempt, hourly positions that are covered by the FLSA, and they have been scheduled to work, and in fact worked, more than forty hours during workweeks between May 2019 and the present. Defendant's Answer to First Amended Complaint, ECF No. 34, at pp. 3-4; Clancy Depo., 85:15-88:23. However, since May of 2019, Plaintiffs and Opt-In Plaintiffs have not been paid for all overtime hours worked, as described *infra*, and the Court should therefore grant summary judgment as to Plaintiffs' and Opt-In Plaintiffs' overtime cause of action.

### A.   Plaintiffs' and Opt-In Plaintiffs' Time Spent Washing Hands and Sanitizing in Building 14 is not Excluded from Compensability by 29 U.S.C. §203(o) and The CBA as Time Spent "Changing Clothes"

Defendant contends that—based on Article 43.1[11] of the CBA—there is no compensation

due for the time employees spend donning and doffing uniforms, dedicated shoes (i.e., work

boots or work shoes), and bump caps since May 2019. Clancy Depo., 65:21-66:9. This

contention is consistent with Defendant's motion to dismiss Plaintiffs' FLSA claim for failure to

state a claim (ECF No. 26)—which was denied by this Court on January 20, 2021 (ECF No.

30)—which argued that 29 U.S.C. §203(o)[12] and Article 43.1 of the CBA bar Plaintiffs' overtime

claims as to "time spent in changing clothes" at the beginning or end of the workday.

Any exclusion of otherwise compensable time while "changing clothes" under Section

203(o) of the FLSA is only effective in regards to time spent donning and doffing items that are

properly defined as "clothes," which this Court recognized when denying Defendant's motion to

dismiss. *See* ECF No. 30, at pp. 4-5; *Sandifer v. US Steel*, 571 U.S. 220, 227-28 (2014) (holding

that the term "clothes" as used in Section 203(o) means "items that are both designed and used to

cover the body and are commonly regarded as articles of dress."). In *Sandifer*, the United States

Supreme Court distinguished between "clothes and wearable items that are not clothes, such as

some equipment and devices." *Id.* at 230, 233 (concluding that nine particular items, including "a

flame-retardant jacket, pair of pants, and hood; a hardhat; a snood; wristlets; work gloves;

leggings; [and] metatarsal boots" meet the definition of "clothes," whereas "safety glasses;

earplugs; and a respirator" did not meet the definition of "clothes."). Pursuant to *Sandifer*, "If an

employee devotes the vast majority of the time in question to putting on and off equipment or

---

[11] Article 43.1 of the CBA provides that "Employees shall be required to change clothing on Company premises, and that time shall not be counted as time worked. . . ." See ECF No. 26-1. Notably, Article 43.1 does not exclude from time worked any time spent "washing."

[12] Specifically, Section 203(o) of the FLSA states, "In determining for the purposes of sections 206 and 207 of this title the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee."

other non-clothes items . . . the entire period would not qualify as 'time spent in changing clothes' under §203(o), even if some clothes items were donned and doffed as well. But if the vast majority of the time is spent in donning and doffing 'clothes' . . . the entire period qualifies, and the time spent putting on and off other items need not be subtracted." *Id.* at 235. The Supreme Court in *Sandifer* also noted that "it is most unlikely Congress meant §203(o) to convert federal judges into time-study professionals[,]" which would be necessitated if they were "assigned the task of separating the minutes spent clothes-changing . . . from the minutes devoted to other activities during the period in question." *Id.* at 233-34.

Significantly, all of the "clothes and wearable items that are not clothes" (*Id.* at 230) at issue in *Sandifer* was donned in a locker room at the U.S. Steel plant immediately before the employees walked from that locker room to their workstations. *Sandifer v. United States Steel Corp.*, 678 F.3d 590, 591 (7th Cir. 2012). But here, that is not the case. Rather, Defendant's CUP policy since May 2019 necessitates three main steps for its production employees prior to clocking in: (1) changing clothes in Building 8; (2) walking from Building 8 to Building 14 to wash and sanitize; and (3) walking from Building 14 to the employee's respective production building to clock in. It is undisputed that since the adoption of the CUP, Defendant's production employees enter the Battle Creek facility through Building 8, which is the building where they hang up and store their street clothing and shoes, retrieve their dedicated work shoes and uniforms, and change into their dedicated shoes and uniforms. Ford Depo., 8:23-9:21, 10:1-24. Only after Defendant's production employees have changed into their dedicated shoes and uniforms within the Building 8 locker rooms do they walk to Building 14 in order to wash their hands and sanitize their dedicated shoes, bump cap, backpacks, and other equipment or personal

items. *Id.* 11:8-13:4. They also pick up their earplugs and hair nets in Building 14, by the hand wash sinks, which they must put on before entering production buildings. *Id.* 12:4-8, 13:5-13.

Plaintiffs and Opt-In Plaintiffs who work in production areas do not dispute that the time they spend changing out of street clothes and into their dedicated shoes and uniforms—all of which takes place in Building 8 and the locker rooms therein—is time spent "changing clothes" pursuant to the Section 203(o) and the CBA. The "vast majority of the time" in Building 8 and its locker rooms is, on the whole, spent donning and doffing "clothes." *Sandifer*, 571 U.S. at 235. However, unlike in *Sandifer*, after Defendant's production employees change into their dedicated shoes and uniforms and leave the locker room, they must walk to a separate building (Building 14) where they wash and sanitize, as described above, before walking to their work areas. The vast majority of time spent in Building 14 is not time spent changing clothes, because production employees have already donned their dedicated shoes and uniforms in a different building before walking to Building 14. Rather, the vast majority of their time in Building 14 is spent washing and sanitizing (and waiting to wash and sanitize), which should not be excluded as time spent "changing clothes" pursuant to Section 203(o). These Building 8 and Building 14 time periods are easily separable: time in Building 8 is "on the whole" spent changing clothes; and time in Building 14 is "on the whole" spent washing and sanitizing. *Sandifer*, 571 U.S. at 235. *See also Castaneda v. JBS USA, LLC*, 819 F.3d 1237, 1250 (10th Cir. 2016) (concluding that the CBA could "exclude the locker-room activities from compensation under §203(o) because under *Sandifer* . . . the locker-room time was devoted "on the whole" to changing clothes.").

The other time Defendant's production employees spend in Building 14—besides washing hands[13] and sanitizing[14] (and waiting to wash and sanitize)—is spent picking up earplugs and hair nets, which must be put on before entering production buildings. Ford Depo., 12:4-8, 13:5-13. As to Defendant's requirement that Plaintiffs and Opt-In Plaintiffs don and doff earplugs off-the-clock since at least May 2019 (*Id.* 12:4-8, 13:5-13, 13:24-14:4, 15:12-24), *Sandifer* expressly states that earplugs and safety glasses are not considered "clothes" pursuant to Section 203(o). *Sandifer*, 571 U.S. at 233. Nor are hairnets clothes," because they serve no purpose other than to protect cereal from contamination, and they are not "commonly regarded as articles of dress." *Sandifer*, 571 U.S. at 227; *see also Hoyt v. Ellsworth Coop. Creamery*, 579 F. Supp. 2d 1132, 1139-40 (W.D. Wis. 2008) (finding, prior to *Sandifer*, that a hairnet is part of the employer's sanitary/safety uniform, that sanitary/safety uniforms "are required by defendant and they must be worn to help ensure that defendant's products are sanitary in satisfaction of defendant's customers' demands and state law[,]" and that the sanitary/safety uniforms "cannot as a matter of law be 'clothes' under [Section 203(o)]" and the donning and doffing of sanitary/safety uniforms therefore "cannot be excluded from being considered compensable 'hours worked.'"). Even if hairnets are properly classified as "clothes," the time Plaintiffs and

---

[13] As noted above, Article 43.1 of the CBA does not exclude from time worked any time spent "washing." See ECF No. 26-1.

[14] Defendant requires its employees to sanitize the bottom of their dedicated shoes and any equipment (i.e., lunch containers, backpacks, purses, radios, tools, and any personal items) as part of the CUP. Ford Depo., 11:8-13:4; ECF No. 26-2, PageID 124. Such wearable equipment is not "clothes" within the meaning of Section 203(o) since it is not "both designed and used to cover the body" or "commonly regarded as articles of dress." *Sandifer*, 571 U.S. at 227. Notably, the Supreme Court in *Sandifer* adopted a definition of "clothes" that is "considerably more contained" than that adopted by some Courts of Appeal, which had previously embraced a definition "that 'clothes' means essentially anything worn on the body—including accessories, tools, and so forth." *Id.* at 230 (explaining that many accessories—such as knapsacks—and tools do not meet the definition of "clothes" under the construction being adopted by the Court, and that its "definition leaves room for distinguishing between clothes and wearable items that are not clothes, such as some equipment and devices.").

Opt-In Plaintiffs spend on Building 14 activities cannot "on the whole" be considered time changing clothes.

Accordingly, while Plaintiffs and Opt-In Plaintiffs time in Building 8 is time spent "changing clothes," the time they spend in Building 14 washing and sanitizing[15] should, as a matter of law, not be excluded pursuant to Section 203(o) and the CBA.

### B. Plaintiffs' and Opt-In Plaintiffs' Time Spent on COVID Screening and Off-the-Clock CUP Tasks is Compensable, and Not Excluded by the Portal-to-Portal Act

Even though the time Plaintiffs and Opt-In Plaintiffs working in production areas spend donning and doffing their dedicated shoes and uniforms would be excluded from compensability pursuant to 29 U.S.C. §203(o) and Article 43.1 of the CBA as time spent "changing clothes," Plaintiffs and Opt-In Plaintiffs are still entitled to overtime compensation for this donning and doffing time—as well as all time spent on COVID screening and Off-The-Clock CUP Tasks— because it is part of the continuous workday after they perform their first principal activity.

### 1) The Portal-to-Portal Act and Continuous Workday Rule

The United States Supreme Court has broadly interpreted the term "work" under the FLSA to mean "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 31 (2014) (quoting *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)).[16]

Pursuant to the Portal-to-Portal Act, 29 U.S.C. §254(a)(1)-(2), the following activities are excluded from those that are compensable under the FLSA: "(1) walking, riding, or traveling to

---

[15] This includes time walking to Building 14 and their work stations.

[16] The Supreme Court similarly defined "the statutory workweek" under the FLSA to "include[] all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690-91 (1946).

and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities. . . ."

In *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29, 33 (2005), the United States Supreme Court held that an employee begins his or her "work" when he or she performs activities that are "integral and indispensable" to the "principal activities" he or she are hired to perform, and the employee's "work" ends when he or she performs "the last principal activity" integral and indispensable to his or her principal activities. *Id.* Under the Portal-to-Portal Act, a Court must first determine the "principal activity or activities which such employee is employed to perform[.]" 29 U.S.C. §254(a). In *Integrity Staffing*, the United States Supreme Court noted that it "has consistently interpreted []the term 'principal activity or activities' [to] embrac[e] all activities which are an 'integral and indispensable part of the principal activities.'" 574  U.S. at 33 (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29-30 (2005) and quoting *Steiner v. Mitchell*, 350 U.S. 247, 252-53 (1956)). "[A]n activity is integral and indispensable to the principal activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Id.* at 37.

Moreover, "the Portal-to-Portal Act did not alter what is known as the 'continuous workday rule,' under which compensable time comprises 'the period between the commencement and completion on the same workday of an employee's principal activity or activities . . . [,] whether or not the employee engages in work throughout all of that period.'"

15

*Sandifer*, 571 U.S. at 226 (quoting 29 CFR §790.6(b)). *See also IBP, Inc.*, 546 U.S. at 29 (discussing the adoption of the continuous workday rule). Thus, the FLSA does not exempt any activities which occur after the first principal activity and before the last principal activity:

> Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked to the same extent as would be required if the Portal Act had not been enacted.

29 C.F.R. §790.6(a); *see also* 29 C.F.R. §785.12 ("travel from job site to job site during the workday[,] must be counted as hours worked" and work may take place "away from the premises or the job site, or even at home.").

### 2) Plaintiffs' and Opt-In Plaintiffs' Principal Activity is the Production of Uncontaminated Cereal

Plaintiffs have all worked at Defendant's cereal manufacturing plant in Battle Creek between May 2019 through the present, and Defendant's employees in the production areas of the Battle Creek facility are responsible for producing cereal. Defendant's Answer to First Amended Complaint, ECF No. 34, at pp. 3-4; Hakman Depo., 4:22-5:24 (Mr. Hakman, Defendant's Plant Manager and its highest ranking official at Battle Creek, testified that he is responsible for its hourly employees and the day-to-day operation of producing "about 300 million pounds" of cereal at the Battle Creek facility). Since at least May 2019, all of Defendant's employees who work within the production areas of the facility are required to follow the CUP procedures, including being required to wash, sanitize, don and doff clean uniforms and dedicated shoes, and wear hairnets within Defendant's production buildings. Ford Depo., 8:13-22; ECF No. 26-2, PageID 122-124. Moreover, the purpose of the CUP is to decrease or diminish contaminants within the production areas of the plant, and to "break the outside from the inside of the plant, in order to prevent the transfer of microbiological

contaminants into the facility, through potentially contaminated footwear and outer clothing."
Ford Depo., 7:16-20, 8:13-22, 9:22-25; Clancy Depo., 76:13-77:3; ECF No. 26-2, PageID 122.

Accordingly—and as previously inferred by this Court—the principal employment
activity of Plaintiffs and Opt-In Plaintiffs who work in the production areas of Defendant's
Battle Creek facility is the production of uncontaminated cereal. *See* ECF No. 30, at pp. 5-6 ("It
is not difficult to infer that Plaintiffs' principal activity is the production of cereal, for which
sanitation is important."); *accord Franklin v. Kellogg*, 619 F.3d 604, 620 (6th Cir. 2010) (finding
that Kellogg's policy of requiring its production employees to don and doff a uniform and
equipment in its frozen breakfast foods manufacturing plant "is both integral and indispensable[,]
and it "ensures sanitary working conditions and untainted products."); *UFCW Local 1473 v.
Hormel Foods*, 367 Wis. 2d 131, 157 (Wis. 2016) (applying *Integrity Staffing* and *Sandifer* in
concluding "that donning and doffing [] clothing and equipment at the beginning and end of the
day . . . is 'integral and indispensable' to the employees' principal activities of producing food
products[,]" after noting cleanliness and food safety are intrinsic elements of the principal
activity of preparing food); *Steiner v. Mitchell*, 350 U.S. at ("changing clothes and showering are
[] an integral and indispensable part of the principal activity of employment" of employees
working in a plant manufacturing wet storage batteries). Any activity which is "integral and
indispensable" to the principal activity of producing uncontaminated cereal "is itself a principal
activity" under the Portal-to-Portal Act. *IBP, Inc.*, 546 U.S. at 37.

### 3) COVID Screening is Integral and Indispensable to Plaintiffs'[17] and Opt-In Plaintiffs' Principal Activity

---

[17] The Opt-In Plaintiffs' claims for unpaid COVID screening time was described in Plaintiffs' Notice of Additional Factual Basis for Opt-In Plaintiffs' FLSA Claims (ECF No. 57). While not explicitly included in their First Amended Complaint, the named Plaintiffs in this action are also subject to COVID screening time and have this same factual predicate and claim, which is arguably already included in their FLSA claim for unpaid overtime wages. Accordingly, Plaintiffs also join in this part of the Motion.

Defendant's mandatory pre-shift COVID screenings are necessary to ensure a safe and sanitary workplace, and they are integral and indispensable to the principal activity of producing uncontaminated cereal by (a) ensuring the virus does not infect Defendant's Battle Creek employees, managers, and facilities, disrupting the cereal production work performed by Plaintiffs and Opt-In Plaintiffs, and correspondingly, Defendant's business operations; (b) preventing potential COVID-19 contamination of food products; and (c) ensuring compliance with state mandates requiring COVID screening.

Here, it is undisputed that since Defendant launched its COVID screening program on April 23, 2020, it has required all of its employees to undergo COVID self-assessments, a questionnaire, and a temperature check every workday before clocking in and before performing the Off-The-Clock CUP Tasks (Clancy Depo., 13:24-15:15), and Defendant has not compensated any Plaintiff or Opt-In Plaintiff for off-the-clock COVID screening time (*Id.* 18:18-23, 64:3-9). The stated purpose of Defendant's COVID screening program is "to keep employees safe during the COVID pandemic . . ." and the screening is necessary to promote safety from COVID-19 and the wellness of Defendant's employees while they were working during the pandemic. Clancy Depo., 19:24-20:15, 22:1-6; Hakman Depo., 19:24-20:15, 22:1-6 (testifying in his personal capacity that Defendant had "too many" COVID-19 cases in 2020, that such infections took processes down, and that "most of [Post taking processes down due to COVID-19 infections] was prior to some of these precautions that we put in place."). Defendant also implemented its COVID screening program because it is "required by State law . . . as a manufacturing facility[] to have temperature checks and wellness screens." Clancy Depo., 19:24-20:15. This is true, in part, because indoor food production facilities are known to be vectors for COVID-19 outbreaks.

18

Notably, the United Stated Department of Labor ("DOL"), Wage and Hour Division has

issued guidance that employees must be paid under the FLSA for pre-shift COVID-19

temperature checks and health screenings if they are "necessary for their jobs":

> **4. My employer requires all employees to take their temperature to try to screen for people who might have COVID-19 before entering the job site. Do I need to be paid for the time spent taking my temperature?**
>
> It depends, under the FLSA, your employer is required to pay you for all hours that you work, including for time before you begin your normal working hours if the task that you are required to perform is necessary for the work you do.  **For many employees, undergoing a temperature check before they begin work must be paid because it is necessary for their jobs.** For example, if a nurse who performs direct patient care services at a hospital is required to check her temperature upon arrival at the hospital before her shift, the time that she spends checking her temperature upon entry to the worksite **is likely compensable because such a task is necessary for her to safely and effectively perform her job during the pandemic**.  In other words, the temperature check is integral and indispensable to the nurse's job. . . .

(emphasis added).[18] It is clear the DOL, in issuing this guidance, was aware of the

"integral and indispensable" standard set forth by the Supreme Court in *Integrity Staffing*

before opining that COVID-19 temperature checks must be paid "[f]or many

employees."[19]

---

[18] See DOL, Wage and Hour Division, *COVID-19 and the Fair Labor Standards Act Questions and Answers*, Q&A No. 4, www.dol.gov/agencies/whd/flsa/pandemic#6. See also Q&A No. 6: "if you are required to complete a health screening during your workday, your employer must pay you for that time. . . . Specifically, WHD's regulations require that employees be paid for time spent in waiting for and receiving medical attention required by their employer during the workday. The same logic applies to a COVID-19 health screening required by your employer during your workday."

[19] *See* Allan Bloom, *Do We Have to Pay for That?  Part 1—COVID-19 Vaccination, Testing, and Screening Activities*, Proskauer Rose LLP Law and the Workplace Blog (Jan. 13, 2022), https://www.lawandtheworkplace.com/2021/10/do-we-have-to-pay-for-that-part-1-covid-19-vaccination-testing-and-screening-activities/ (the DOL Q&A is "grounded in the principles" of the Portal-to-Portal Act and *Integrity Staffing*, and noting in regards to the DOL's specific example that nurses are "likely required by law and/or medical boards/authorities to be temperature checked."); Kun et al., *Are COVID-19 Temperature Screenings Compensable Time for Non-Exempt Employees?*, Coronavirus (COVID-19) Blog (June 10, 2020) (it is an open question whether temperature checks are compensable, but noting "[w]orkplace temperature screenings could be found to constitute a preshift activity to protect against a heightened workplace danger and/or an activity undertaken for the employer's benefit.").

The DOL has also issued regulations stating that physical and health examinations, which would certainly include COVID screenings and temperature checks, constitute time that should be paid for by employers. *See* 29 C.F.R. §785.43 ("Time spent by an employee in waiting for and receiving medical attention on the premises or at the direction of the employer during the employee's normal working hours on days when he is working constitutes hours worked."). In an opinion letter, the DOL has further stated that:

> Time spent undergoing a physical examination is time during which the employee's freedom of movement is restricted for the purpose of serving the employer and time during which the employee is subject to the employer's discretion and control. **It is immaterial whether the time spent in undergoing the required physical examination is during the employee's normal working hours or during nonworking hours**. **The physical examination is an essential requirement of the job and thus primarily for the benefit of the employer**. **Therefore, it is our opinion that the time so spent must be counted as hours worked under the FLSA.**

Department of Labor, Opinion Letter of the Wage and Hour Administrator, 99-02 CCH-WH ¶32,890 (Oct. 7, 1997) (emphasis added).

At least one federal court has already denied a motion to dismiss FLSA and state law claims associated with time spent on COVID-19 temperature checks and screening. *See Harwell-Payne v. Cudahy Place Senior Living LLC*, No. 2021-cv-328-PP, Dkt. No. 89 (Dec. 7, 2021 E.D. Wis.) (denying defendant's partial motion to dismiss plaintiff's claim under the FLSA and state law for compensation associated with daily completion of off-the-clock temperature checks and symptoms questionnaires by nursing home caregivers). In the *Integrity Staffing* concurring opinion, Justice Sotomayor and Justice Kagan also note that security checks that are directly related to worker safety or efficiency should be covered as compensable time by the FLSA, which courts have agreed with. *Integrity Staffing*, 574 U.S. at 37-38. *See also Aguilar v. Mgmt.*

20

*& Training Corp.*, 948 F.3d 1270, 1278-79 (10th Cir. 2020) (holding that pre-shift security screenings meant to "prevent weapons and other contraband from entering the prison" was compensable time for prison guards because keeping contraband out of the prison is "tied to" the officers' work; "[i]ndeed, the security screening and the officers' work share the same purpose."). Just as the security screenings in *Aguilar* were designed to keep contraband out of a prison, here, Defendant's COVID screening is designed to keep COVID-19 out of its food processing facilities, and it would be far more difficult for Plaintiffs and Opt-In Plaintiffs to perform their jobs if COVID-19 was in the facilities, as it would require isolating employees, adopting special procedures to ensure the non-contamination of cereal being produced, and community spread of COVID-19 among employees would make it far more difficult to adequately staff the production facilities.

For Plaintiffs and Opt-In Plaintiffs to undergo COVID screening designed to keep them safe and to promote their wellness while working during the pandemic is integral and indispensable to their principal activity of being able to produce uncontaminated cereal on-site at Defendant's Battle Creek facility. Since Plaintiffs and Opt-In Plaintiffs must undergo COVID screenings before each shift to demonstrate their continued eligibility to work at the facility, the screenings were indispensable since—as a practical matter—Defendant cannot eliminate them, and they are necessary for Plaintiffs and Opt-In Plaintiffs to safely and effectively perform their production jobs during the pandemic while working in close quarters with many other individuals in a food manufacturing plant. Moreover, COVID screening is for the benefit of Defendant and its customers to ensure its plaint's safe and continuous operations during the pandemic, and to ensure compliance with the state law temperature check mandates,[20] and it

---

[20] In May 2021, Michigan discontinued its state mandate of employer temperature checks but continued to require employers to do pre-shift screenings for COVID-19. See https://www.jdsupra.com/legalnews/michigan-s-covid-19-

would be more difficult to protect the health of Defendant's employees and to ensure the non-disruption of Defendant's processes and production of cereal if the COVID screenings were eliminated, as suggested by Mr. Hakman's personal testimony that most of the COVID-19 outbreaks that took Defendant's processes down occurred prior to Defendant putting COVID-19 screening processes in place. Hakman Depo., 24:16-26:3.

In other words, COVID screenings have a nexus to Plaintiffs' and Opt-In Plaintiffs' work that the security screenings at issue in *Integrity Staffing* did not have. Whereas those security screenings were required to "prevent employee theft" (*Integrity Staffing*, 574 U.S. at 31), Defendant's COVID screenings are designed to comply with state mandates for manufacturing facilities to have temperature checks and wellness screens (Clancy Depo., 19:24-20:15),[21] to prevent a COVID-19 outbreak that would disrupt its business operations, and to enable employees to safely and sanitarily perform their food production duties in a COVID-free workplace.

Considering the DOL example of a temperature check for a nurse being "necessary for her to safely and effectively perform her job during the pandemic," the same rationale applies to employees working in close contact with others and/or in an environment with many other employees, like a food manufacturing facility. In fact, it is appropriate and consistent with the

emergency-rules-8564639/ ("The new rules remove the requirement to temperature check employees if possible. The daily entry screening requirement remains in effect.").

[21] While not discussed by the Supreme Court in *Integrity Staffing* since security screenings are not required by law, in these unique circumstances of the COVID-19 pandemic, a state mandate requiring COVID screening for manufacturing facility employees like the one Defendant is subject to makes the screening indispensable to the work. Employers subject to such mandates cannot employ workers without COVID screening, making passing daily COVID screening absolutely necessary and a condition to employees' being able to perform their food production work in  the first place. Moreover, the fact that a state law may require a certain activity does not preclude that activity from compensability under the FLSA; in fact, it provides strong evidence that the activity is indispensable to the employee's principal activities. See *Steiner v. Mitchell*, 350 U.S. 247, 248, 256 (time spent changing clothes and showering "in facilities which state law requires their employers to provide" by employees in a battery manufacturing facility was a principal activity because it was made necessary by the nature of the work performed); *Hormel Foods Corp.*, 367 Wis. 2d at 139, 186 (donning and doffing clothing was indispensable when it was the means chosen by the employer to comply with federal cleanliness and safety regulations).

DOL's guidance that employees working in close quarters in food manufacturing be paid for

their COVID screening time since it is necessary for avoiding employee outbreaks, and to

maintain the sanitation of the food products and avoiding the potential infection of customers

through contaminated food products.[22] *See Gatewood v. Koch Foods of Miss., LLC*, 569 F. Supp.

2d 687, 697 (S.D. Miss. 2008) (recognizing the use of sanitary gear allows Koch "to maintain the

cleanliness essential to prevent contamination to its poultry products[,]" and that "their

equipment is worn for sanitary and safety purposes and is required by both law and company

policy."). COVID-19 outbreaks have led to widespread closures at numerous food and beverage

factories,[23] further demonstrating that mandatory COVID screening at such workplaces is for

safety and sanitation purposes, which is the same purpose as Plaintiffs' and Opt-In Plaintiffs'

primary activity of producing uncontaminated cereal. By way of example, preventing droplets of

COVID-19 from contaminating cereal being produced by a production employee sneezing or

coughing—which may be avoided through COVID screening which admits facility access only

to those employees verified to be symptom-free while excluding symptomatic employees—is an

additional way to ensure uncontaminated cereal, which is Plaintiffs' and Opt-In Plaintiffs'

principal activity. The purpose is for sanitation and security, which is the same purpose for

employees donning uniforms, dedicated shoes, and for wearing hairnets to prevent hair from

---

[22] *See* Han et al., *Can the coronavirus disease be transmitted from food? A review of evidence, risks, policies and knowledge gaps*, National Center for Biotechnology Information (Oct. 1, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7529092/ (reviewing the evidence and risk factors on food contamination and foodborne transmission of SARS-CoV-2, discussing the detection of SARS-CoV-2 in frozen foods as "alerting signs that viral contamination and foodborne transmission may present a systematic risk in the ongoing pandemic[,]" and discussing clustered COVID-19 infections at food processing facilities that have prompted concerns that such "locations may be potential 'hot spots' of COVID-19 infections which may lead to large-scale food contamination."); Dr. Liji Thomas, *Can SARS-CoV-2 be transmitted in the food cold chain?*, News Medical Life Sciences (Aug. 30, 2021), https://www.news-medical.net/news/20210830/Can-SARS-CoV-2-be-transmitted-in-the-food-cold-chain.aspx (a study by researchers found the risk of being infected with COVID-19 while unpacking products in a cold chain is reduced by the protective measures of masking and handwashing).
[23] For a tracker of COVID-19 closures at food and beverage factories, see https://www.fooddive.com/news/tracking-coronavirus-closures-at-food-and-beverage-factories/576559/ (updated Dec. 8, 2020).

getting on cereal that is being produced. Accordingly, COVID screening for Plaintiffs and Opt-In Plaintiffs working in production areas is necessary for their jobs, which puts them squarely within the "many employees" the DOL believes must be compensated for such screening.

Moreover, as part of its daily COVID screening program, Defendant advised its managers and employees to "give yourself at least 10 minutes prior to your scheduled shift to get through the screening process[,]" and its employees could be and were disciplined for not complying with COVID screening requirements. Clancy Depo., 24:4-25:6, 29:9-25, 30:1-33:2, 53:15-54:11, 56:20-25, 62:16-64:2. Because Defendant requires its employees to report to its Battle Creek facility—the place where Defendant's employees produce cereal—under threat of discipline at a certain specific time, i.e., 10 minutes prior to their scheduled shift, Plaintiffs' and Opt-In Plaintiffs' workday commences at the time they report for COVID screening pursuant to Defendant's requirement. *See* 29 C.F.R. 790.6(b) ("If an employee is required to report at the actual place of performance of his principal activity at a certain specific time, his 'workday' commences at the time he reports there for work in accordance with the employer's requirement, even though through a cause beyond the employee's control, he is not able to commence performance of his productive activities until a later time.").

Thus, Defendant has violated the FLSA by failing to pay for Plaintiffs' and Opt-In Plaintiffs' time spent undergoing COVID screening since April 23, 2020. Because COVID screening is "integral and indispensable" to the principal activity of producing uncontaminated cereal, it "is itself a principal activity" under the Portal-to-Portal Act. *IBP, Inc.*, 546 U.S. at 37. Pursuant to the "continuous workday rule," Plaintiffs' and Opt-In Plaintiffs' compensable time since April 23, 2020 comprises the period between the time they arrive outside of Defendant's facility for COVID screening (the commencement of their principal activities) and the time they

24

place their dirty uniforms in dirty clothes bins after clocking out and post-doffing (the completion of their principal activities). *IBP, Inc.*, 546 U.S. at 29; 29 CFR §790.6(b).

Accordingly, all off-the-clock time between arriving for COVID screenings and placing dirty uniforms in dirty clothes bins is compensable, since the FLSA does not exempt any activities which occur after the first principal activity and before the last principal activity. 29 C.F.R. §790.6(a); *see also Arnold v. Schreiber Foods, Inc.*, 690 F. Supp. 2d 672, 684-85, n.15 (M.D. Tenn. 2010) ("§203(o), by its terms, applies only to clothes changing that occurs 'at the beginning or end of each workday.' This implies that such activities are work and that the continuous-work-day clock has already started to run.");[24] *Scalia v. AWP, Inc.*, 2020 U.S. Dist. LEXIS 241258, at *15 (W.D. Mich. Dec. 23, 2020) (citing 29 C.F.R. §790.6(b) and *IBP, Inc.*, and concluding that "the bounds of the workday are set by the first and last integral and indispensable activities performed by an employee."); *Aguilar*, 948 F.3d at 1279-80 ("Because the time the officers devote to undergoing the security screening is integral and indispensable to their principal activities, that activity begins their workday. Thus, we further hold that the time the officers devote to receiving the preshift briefing, picking up keys and equipment, walking to post, and conducting the preshift passdown briefing is also compensable under the FLSA."); *Russano v. Premier Aerial & Fleet Inspections, LLC*, 2016 U.S. Dist. LEXIS 102313, at *6 (E.D. Mich. Aug. 4, 2016) (recognizing that "[o]nce the work day starts, all activity is ordinarily compensable until the word day ends[,]" and noting, after *Integrity Staffing Solutions*, that "[a]ctivity that primarily benefits the employer is not preliminary or postliminary, regardless of when or where that activity takes place.") (citation omitted).

---

[24] *See also De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 373 (3d Cir. 2007) ("[Section 203(o)] provides at least some indication that [clothes changing] is itself properly considered 'work' under the FLSA."); *Steiner*, 350 U.S. at 255 (noting 203(o) applies to "clothes changing and washing, which are otherwise a part of the principal activity").

    4)   **Donning and Doffing Uniforms and Dedicated Shoes is Integral and Indispensable to Plaintiffs' and Opt-In Plaintiffs' Principal Activity**

As explained above, from April 23, 2020 to the present, COVID screening is Plaintiffs' and Opt-In Plaintiffs' first principal activity. However, from May 28, 2019 until April 23, 2020, before Defendant launched its COVID screening program, Plaintiffs' and Opt-In Plaintiffs' first principal activity was their off-the-clock donning of dedicated shoes and uniforms pursuant to the CUP.[25]

It is undisputed that since the adoption of the CUP, the first activities that Plaintiffs and Opt-In Plaintiffs who work in production areas are required to perform after entering Building 8 of Defendant's Battle Creek facility are to don their dedicated shoes, then proceed to the uniform area to grab their uniform, and then proceed to the locker room and change into their uniforms. Ford Depo., 8:23-10:24; ECF No. 26-2, PageID 123. Regardless of whether the time Plaintiffs and Opt-In Plaintiffs spend donning their dedicated shoes and uniforms is compensable itself pursuant to 29 U.S.C. §203(o) and Article 43.1 of the CBA as time spent "changing clothes," these activities are integral and indispensable to their primary activity of producing uncontaminated cereal, and therefore principal activities themselves. Ford Depo., 8:10-22, 9:22-25; ECF No. 26-2, PageID 122 ("The purpose of the [CUP] is to "break the outside from the inside of the plant, in order to prevent the transfer of microbiological contaminants into the facility, through potentially contaminated footwear and outer clothing. . . .").

Significantly, the Sixth Circuit Court of Appeals in *Franklin v. Kellogg Co.* found that Kellogg's policy of requiring its employees to don and doff a uniform and equipment in its

---

[25] Thus, even if this Court were somehow to determine that COVID screening is not integral and indispensable to Plaintiffs' and Opt-In Plaintiffs' principal activity beginning on April 23, 2020 (which it should not), this Court should then rule alternatively, as a matter of law, that Plaintiffs' and Opt-In Plaintiffs' donning of dedicated shoes and uniforms was their first principal activity from May 28, 2019 to present.

frozen breakfast foods manufacturing plant "is both integral and indispensable[,] and it "ensures sanitary working conditions and untainted products." *Franklin v. Kellogg Co.*, 619 F.3d 604, 620 (6th Cir. 2010).[26] As recognized by this Court in its Order denying Defendant's motion to dismiss (ECF No. 30, at pp. 8-9), the Sixth Circuit in *Franklin* also held that compensability under 29 U.S.C. §203(o) (regarding changing clothes) "is unrelated to whether an activity is a 'principal activity.'" *Id.* at 619. Ultimately, the Sixth Circuit in *Franklin* held that donning and doffing food safety uniforms and protective equipment is both integral and indispensable, and because any activity that is integral and indispensable to a principal activity is itself a principal activity, donning and doffing the uniform and standard equipment is a "principal activity." *Id.* at 620 ("Accordingly, under the continuous workday rule, Franklin may be entitled to payment for her post-donning and pre-doffing walking time.").

Here, pursuant to the CUP, after Plaintiffs and Opt-In Plaintiffs finish donning their dedicated shoes and uniforms in Building 8 of Defendant's Battle Creek facility (Ford Depo., 8:23-10:24; ECF No. 26-2, PageID 123), they are required to walk from Building 8 to Building 14 in order to wash their hands and sanitize their dedicated shoes, bump cap, backpacks, and other equipment or personal items. Ford Depo., 11:8-13:4. Plaintiffs and Opt-In Plaintiffs also pick up their hair nets and earplugs in Building 14, by the hand wash sinks, which they must put on before entering the production buildings. *Id.* 12:4-8, 13:5-13. Plaintiffs and Opt-In Plaintiffs then walk from Building 14 through one of two walkway routes to the production building where they are assigned to work, which is also where their respective time clocks are located. *Id.* 14:13-

---

[26] The Sixth Circuit in *Franklin* adopted the following three-prong test for determining whether an activity is integral and indispensable to an employee's principal activities: "(1) whether the activity is required by the employer; (2) whether the activity is necessary for the employee to perform his or her duties; and (3) whether the activity primarily benefits the employer." *Id.* at 619-20. Subsequently, in holding that an activity is integral and indispensable to principal activities "if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities[,]" the U.S. Supreme Court in *Integrity Staffing Solutions* rejected the first and third "principal activity" factors adopted in *Franklin*.

15:11. Before they get to their assigned work area and before they clock-in, Plaintiffs and Opt-In Plaintiffs must leave any lunchboxes in a break room and then must re-wash their hands and re-sanitize their shoes when they leave the break room. *Id.* 15:25-16:19. After Plaintiffs' and Opt-In Plaintiffs' shifts end, they clock out at the time clock in the production building where they work, walk back to the locker rooms in Building 8, change out of their uniforms, and place their dirty uniforms in dirty clothes bins around the corner from Building 8. *Id.* 16:20-24, 17:4-18:3.

Significantly, the donning and doffing policies at issue in *Franklin* are virtually identical to the CUP donning and doffing policies at issue here. Kellogg's policies in the *Franklin* case, like the CUP, required employees to: wear company-provided uniforms and shoes (the "uniform"); wear hairnets, safety glasses, earplugs, and bump caps (the "standard equipment"); and "change into their uniforms and standard equipment upon arriving at the Plant, and to change back into their regular clothes before leaving the Plant, so that the uniform and equipment can be washed at the Plant." *Id.* at 608. Consistent with the Sixth Circuit's holding in *Franklin*, the donning and doffing of uniforms and dedicated shoes here—which admittedly prevents the transfer of microbiological contaminants into the facility—is both integral and indispensable to Plaintiffs' and Opt-In Plaintiffs' principal activity of producing uncontaminated cereal. Like with Kellogg's policies, the CUP "ensures sanitary working conditions and untainted products," (*Id.* at 620) and is therefore tied to, and integral and indispensable to, the productive work of producing uncontaminated cereal.

Because any activity that is integral and indispensable to a principal activity is itself a principal activity, donning and doffing the uniform and dedicated shoes in Building 8—both before walking to Building 14 pre-shift and after clocking out post-shift—are "principal activities." *Id.* at 619; *IBP, Inc.*, 546 U.S. at 34 (holding that [w]alking to [the locker room where

the safety gear is donned] before starting work is excluded from FLSA coverage, but the statutory text does not exclude walking from that place to another area within the plant immediately after the workday has commenced."). *See also McDonald v. Kellogg Co.*, 2011 U.S. Dist. LEXIS 143084, at *16-17 (D. Kan. Dec. 13, 2011) (recognizing that where donning and doffing "is an integral and indispensable activity, any post-donning and pre-doffing walking time (*i.e.,* between locker rooms and production areas) would be compensable under the Portal-to-Portal Act.") (citing *IBP*, 546 U.S. at 37 and *Salazar v. Butterball, LLC*, 644 F.3d 1130, 1135 (10th Cir. 2011)); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 367 (4th Cir. 2011) ("[D]onning and doffing of [poultry plant] employees' protective gear at the beginning and end of work shifts is necessary to their work on the 'production line.' The overriding concerns of safety and sanitation plainly mandate this conclusion."); *Duncan-Watts v. Nestle USA, Inc*., No. 1:19-cv-1437, 2020 U.S. Dist. LEXIS 18647, at *11 (N.D. Ohio Feb. 5, 2020) (denying defendant's motion to dismiss, noting that the *Integrity Staffing* "integral and indispensable test is tied to the productive work that the employee is employed to perform[,]" and finding that "donning and doffing protective gear to keep food sanitary is linked with the performance of plaintiff's job duties of food manufacturing and packaging."); *Steiner*, 350 U.S. at 256 (holding that the donning and doffing of protective gear by employees in a battery manufacturing facility was a principal activity because it was made necessary by the nature of the work performed in the factory); *Johnson v. Koch Foods, Inc.*, 670 F. Supp. 2d 657, 669 (E.D. Tenn. 2009) ("[P]rincipal activity is processing sanitary and uncontaminated chicken, and [the employer] needs its employees to wash and wear protect clothing to accomplish this goal."); *Arnold*, 690 F. Supp. 2d at 683 ("Employees are required to don the uniforms at Schreiber's plant, and the benefit of the sanitary uniforms to Schreiber is obvious – it allows the company to create

29

uncontaminated food products."); *Mitchell v. King Packing Co.*, 350 U.S. 260, 262-63 (1956) (time spent sharpening knives for work at a slaughterhouse is integral and indispensable).

Accordingly, and pursuant to the continuous workday rule, from May 28, 2019 until the April 23, 2020 launch of Defendant's COVID-19 Screening Program,[27] all time (a) after Plaintiffs' and Opt-In Plaintiffs' first principal activity of donning dedicated shoes and uniforms, and (b) before their last principal activity of placing their dirty uniforms in dirty clothes bins post-doffing,[28] is compensable. Because there is no dispute that since May 2019, all Battle Creek production employees were required to follow the CUP procedures (Ford Depo., 21:13-20), and all Off-The-Clock CUP Tasks—including time (a) waiting in line to wash hands or sanitize; (b) sanitizing; (c) washing hands; (d) donning and doffing earplugs and hairnets; (e) walking from locker rooms and sanitizing stations to workstations post-donning, and before clocking in; and (f) walking from workstations after clocking out to deposit uniforms and/or other items into receptacles and clothes bins—are off-the-clock activities either before clocking in or after clocking out that Defendant does not compensate production employees for (*Id.* 15:12-24; Clancy Depo., 69:5-71:25, 73:9-15, 91:3-16), those activities are not affected by the Portal-to-Portal Act and Defendant has unlawfully failed to pay Plaintiffs and Opt-In Plaintiffs for such compensable time under the FLSA.

## V.     CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Partial Summary Judgment on Liability as a matter of law on their unpaid overtime cause of action.

---

[27] Or, alternatively, until the present if this Court determines COVID-19 screening is not a principal activity.
[28] See *IBP, Inc.*, 546 U.S. 21 at 40 ("Because doffing gear that is 'integral and indispensable' to employees' work is a 'principal activity' under the statute, the continuous workday rule mandates that time spent waiting to doff is not affected by the Portal-to-Portal Act and is instead covered by the FLSA.").

Dated: February 2, 2022

<u>/s/ Matthew J. Clark</u>
Matthew J. Clark (P76690)
Gordon A. Gregory (P14359)
Richard M. Olszewski (P81335)
Gregory, Moore, Brooks & Clark, P.C.
28 W. Adams Ave., Suite 300
Detroit, MI 48226
(313) 964-5600
matt@unionlaw.net

Craig J. Ackermann, *admitted pro hac vice*
Brian W. Denlinger, *admitted pro hac vice*
ACKERMANN & TILAJEF, P.C.
1180 South Beverly Drive, Suite 610
Los Angeles, CA 90035
Telephone: (310) 277-0614
E-mail: cja@ackermanntilajef.com
          bd@ackermanntilajef.com

*Attorneys for Plaintiff*