## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KEITH HOWARD, ARCHIE SMITH,
STEPHANIE BANKS, KEVIN JACKSON,
JERRY PANCYZK, MARIANNE
HEIKKILA, TERRY GREENFIELD, AND
AUTUMN TENDZIELOSKI, on behalf of
themselves and all other persons similarly
situated, known and unknown,

               Plaintiffs,

v.

POST FOODS, LLC, a Delaware Limited
Liability Company,

               Defendant.

Case No. 19-cv-00570

Honorable Hala Y. Jarbou

**ORAL ARGUMENT REQUESTED**

---

Matthew J. Clark (P76690)
Gordon A. Gregory (P14359)
Gregory, Moore, Brooks & Clark, P.C.
28 W. Adams Ave., Ste. 300
Detroit, MI 48226
(313) 964-5600
matt@unionlaw.net
Attorneys for Plaintiff

Craig J. Ackermann
Brian W. Denlinger
ACKERMANN TILAJEF
1180 S. Beverly Drive, Ste. 610
Los Angeles, CA 90035
(310) 277-0614
cja@ackermanntilajef.com
brian.w.denlinger@gmail.com
Attorneys for Plaintiffs

Allan S. Rubin (P44420)
Daniel C. Waslawski (P78037)
Elyse K. Culberson (P82132)
JACKSON LEWIS P.C.
2000 Town Center, Ste. 1650
Southfield, MI 48075
(248) 936-1900
allan.rubin@jacksonlewis.com
elyse.culberson@jacksonlewis.com
Attorneys for Defendant

---

**DEFENDANT POST FOODS, LLC'S**
**MOTION FOR SUMMARY JUDGMENT**
**(Oral Argument Requested)**

Post Foods, LLC by and through its counsel Jackson Lewis P.C. moves under Rule 56 of the Federal Rules of Civil Procedure for Summary Judgement because there is no question of material fact, such that Defendant Post Foods, LLC is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). This Motion is supported by the accompanying Brief in Support and Exhibits attached thereto and incorporated by reference herein.

Counsel for Defendant sought concurrence in the relief requested from Plaintiff, but concurrence was denied. A Certificate of Compliance with L.R. 7.2(b)(i) is being filed contemporaneously with this Motion.

Respectfully submitted,

/s/ Allan S. Rubin
Allan S. Rubin (P44420)
Daniel C. Waslawski (P78037)
Elyse K. Culberson (P82132)
JACKSON LEWIS P.C.
Attorneys for Defendant
2000 Town Center, Ste. 1650
Southfield, MI 48075
(248) 936-1900
Allan.rubin@jacksonlewis.com
Daniel.Waslawski@jacksonlewis.com
Elyse.Culberson@jacksonlewis.com

Dated:  February 2, 2022

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KEITH HOWARD, ARCHIE SMITH,
STEPHANIE BANKS, KEVIN JACKSON,
JERRY PANCYZK, MARIANNE
HEIKKILA, TERRY GREENFIELD, AND
AUTUMN TENDZIELOSKI, on behalf of
themselves and all other persons similarly
situated, known and unknown,

       Case No. 19-cv-00570

             Plaintiffs,

       Honorable Hala Y. Jarbou

v.

POST FOODS, LLC, a Delaware Limited
Liability Company,

       **ORAL ARGUMENT REQUESTED**

            Defendant.

---

| | |
|---|---|
| Matthew J. Clark (P76690) | Allan S. Rubin (P44420) |
| Gordon A. Gregory (P14359) | Elyse K. Culberson (P82132) |
| Gregory, Moore, Brooks & Clark, P.C. | JACKSON LEWIS P.C. |
| 28 W. Adams Ave., Ste. 300 | 2000 Town Center, Ste. 1650 |
| Detroit, MI 48226 | Southfield, MI 48075 |
| (313) 964-5600 | (248) 936-1900 |
| matt@unionlaw.net | allan.rubin@jacksonlewis.com |
| Attorneys for Plaintiff | elyse.culberson@jacksonlewis.com |
| | Attorneys for Defendant |

Craig J. Ackermann
Brian W. Denlinger
ACKERMANN TILAJEF
1180 S. Beverly Drive, Ste. 610
Los Angeles, CA 90035
(310) 277-0614
cja@ackermanntilajef.com
brian.w.denlinger@gmail.com
Attorneys for Plaintiffs

---

## DEFENDANT POST FOODS, LLC'S BRIEF IN SUPPORT OF ITS
## <u>MOTION FOR SUMMARY JUDGMENT</u>
### (Oral Argument Requested)

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................................ii

I.      INTRODUCTION ....................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................... 3

        A.      Background ....................................................................................... 3

        B.      Plaintiffs .......................................................................................... 4

        C.      Uniforms Before Implementation of the CUP ................................ 5

        D.      Entry Procedure Before Implementation of the CUP ..................... 6

        E.      The CUP Negotiations In 2015-16 ................................................. 7

        F.      Implementation of the CUP in May 2019 ...................................... 9

                1.      Uniforms After The CUP ..................................................... 9

                2.      The GMP Policy For Production Employees...................... 10

                3.      Entry After The CUP .......................................................... 11

                        i.      Production Employees ............................................. 11

                        ii.     Non-Production Employees ..................................... 14

                        iii.    Post-Shift Duties ..................................................... 14

        G.      Arbitration Over the CUP .............................................................. 14

        H.      2020 CBA ...................................................................................... 15

        I.      Pay and Overtime ........................................................................... 16

III.    ARGUMENT ............................................................................................. 17

        A.      Standard of Review........................................................................ 17

        B.      Plaintiffs' Donning and Doffing Claims Are Precluded By § 203(o) of the FLSA........................................................................................ 18

        C.      Plaintiffs' Wash Time Claims Are Precluded by the Custom or Practice Provision of Section 203(o). ......................................................... 20

        D.      Even If The Time At Issue Is Compensable, Which It Is Not, It Is *De Minimis*. ......................................................................................... 22

        E.      Plaintiffs' Claims are Precluded by the Portal-to-Portal Act........... 23

        F.      The Time Spent Donning and Doffing Does Not Start the Continuous Workday........................................................................................ 29

        G.      Post May Offset Meal Breaks Against Any Claim For Time Worked. ............... 29

IV.     CONCLUSION........................................................................................... 32

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Adair v. ConAgra Foods, Inc.*,
728 F.3d 849 (8th Cir. 2013) ...............................................27

*Alanis v. Tracer Indus. Mgt. Co.*,
1:13-386, 2016 U.S. Dist. LEXIS 108542 ...............................................27

*Allen v. McWane, Inc.*,
593 F.3d 449 (5th Cir. 2010) ...............................................21

*Anderson v. Cagle's Inc.*,
488 F.3d 945 (11th Cir. 2007) ...............................................21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................18

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680 (1946) *overruled in part on other grounds* .......................................22

*Auxer v. Republic Waste Servs. of Ohio Hauling, LLC*,
No. 2:18-212, 2019 U.S. Dist. LEXIS 44404 (S.D. Ohio Mar. 19, 2019)...................18, 19, 20

*Avery v. City of Talladega*,
24 F.3d 1337 (11th Cir. 1994) ...............................................31

*Babcock v. Butler Cnty.*,
806 F.3d 153 (3d Cir. 2015)...............................................31

*Beasley v. Hillcrest Med. Ctr.*,
78 F. App'x 67 (10th Cir. 2003) ...............................................31

*Bolick v. Brevard Cnty. Sheriff's Dep't*,
937 F. Supp. 1560 (M.D. Fla. 1996) ...............................................31

*Bonds v. GMS Mine Repair & Maint., Inc.*,
2015 U.S. Dist. LEXIS 127769 (W.D. Penn. 2015) ...............................................27

*Bonilla v. Baker Concrete Constr., Inc.*,
487 F.3d 1340 (11th Cir. 2007) ...............................................26, 27

*Bridges v. Amoco Polymers, Inc.*,
19 F.Supp.2d 1375 (S.D. Ga. 1997)...............................................31

*Brock v. City of Cincinnati*,
   236 F.3d 793 (6th Cir. 2001) ...............................................................................22, 23

*Castaneda v. JBS USA, LLC*,
   819 F.3d 1237 (10th Cir. 2016) ...........................................................................27, 31

*Cloutier v. City of Phoenix*,
   834 F. Supp. 366 (M.D. Ala. 1993) ..........................................................................31

*Detroit Police Lieutenants & Sergeants Ass'n v. City of Detroit Police Dep't*,
   No. 12-15296 (E.D. Mich. Feb. 11, 2013) ................................................................21

*Eberline v. Douglas J. Holdings, Inc.*,
   982 F.3d 1006 (6th Cir. 2020) ..................................................................................22

*Franklin v. Kellogg Co.*,
   619 F.3d 604 (6th Cir. 2010) ..............................................................19, 20, 21, 25

*Gorman v. Consol. Edison Corp.*,
   488 F.3d 586 (2d Cir. 2007)................................................................................20, 27

*Guyton v. Tyson Foods, Inc.*,
   767 F.3d 754 (8th Cir. 2014) ....................................................................................31

*Hartsell v. Dr. Pepper Bottling Co. of Tex.*,
   207 F.3d 269 (5th Cir. 2000) ....................................................................................31

*Henderson v. Cuyahoga Co.*,
   No. 1:20 CV 1351 ......................................................................................................26

*Herman v. Fabri-Centers of Am.*,
   308 F.3d 580 (6th Cir. 2002) ....................................................................................29

*Holbrook v. Prodomax Automation Ltd.*,
   No. 1-17-219, 2020 U.S. Dist. LEXIS 207134 (W.D. Mich. Nov. 5, 2020) ...........17

*Hoover v. Wyandotte Chem. Corp.*,
   455 F.2d 387 (5th Cir. 1972) ......................................................................................1

*IBP v. Alverez*,
   546 U.S 21. 40-41 (2005) .............................................................................26, 27, 29

*Jackson v. Old EPT, LLC*,
   834 F.3d 872 (8th Cir. 2016) ....................................................................................21

*Leahy v. City of Chicago*,
   96 F.3d 228 (7th Cir. 1996) ......................................................................................31

*Lindow v. U.S.*,
    738 F.2d 1057 (9th Cir. 1984) ............................................................................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...........................................................................................18

*Mitchell v. JCG Indus., Inc.*,
    745 F.3d. 837 (7th Cir. 2014) ...........................................................................19

*Nat'l Lab. Rel. v. Webcor Packaging*,
    118 F.3d 1115 (6th Cir. 1997) ...........................................................................20

*Perez v. Timberline S., LLC*,
    453 F. Supp. 3d 1068 (E.D. Mich. 2020)...........................................................30

*Reich v. S. New Eng. Telcomms. Corp.*,
    121 F.3d 58 (2d Cir. 1997)................................................................................31

*Rosano v. Twp. of Teaneck*,
    754 F.3d 177 (3d Cir. 2014)..............................................................................21

*Roy v. City of Lexington*,
    141 F.3d 533 (4th Cir. 1998) ............................................................................31

*Ruffin v. MotorCity Casino*,
    775 F.3d 807 (6th Cir. 2015) ......................................................................30, 31

*Sandifer v. U.S. Steel Corp.*,
    571 U.S. 220 (2014)..............................................................................18, 19, 23

*Sandifer v. U.S. Steel Corp.*,
    678 F.3d 590 (7th Cir. 2012), *cert. granted, on other grounds*, 133 S. Ct. 1240
    (U.S. 2013)........................................................................................................27

*Scalia v. AWP, Inc.*,
    No. 1-18- 1183, 2020 U.S. Dist. LEXIS 241258 (W.D. Mich. Dec. 23, 2020).....23, 24, 25, 26

*Schaefer v. Walker Bros. Enter.*,
    829 F3d 551 (7th Cir. 2016) ..............................................................................23

*Sec'y of Labor v. Timberline South, LLC*,
    920 F. 3d 1065 (6th Cir. 2019) .........................................................................30

*Smiley v. EI DuPont De Nemours & Co.*,
    839 F.3d 325 (3rd Cir. 2016) ............................................................................29

*Steiner v. Mitchell*,
    350 U.S. 247 (1956)................................................................................24, 26, 27

*Stuntz v. Ashland Elastomers, LLC*,
　　No. 1:14-00173, 2019 U.S. Dist. LEXIS 46229 (E.D. Tex. Feb. 22, 2019) ........................... 27

*Turner v. City of Philadelphia*,
　　262 F.3d 222 (3d Cir. 2001) ................................................................................................ 21

*In re Tyson Foods, Inc.*,
　　694 F. Supp. 2d 1358 (M.D. Ga. 2010) ................................................................................. 1

*UAW Int'l v. TRW Auto. U.S. LLC*,
　　No. 19-2252 (6th Cir. Mar. 11, 2021) .................................................................................. 22

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*,
　　363 U.S. 574 (1960) ............................................................................................................... 22

*Vance v. Amazon.com, Inc.*,
　　852 F.3d 601 (6th Cir. 2017) ............................................................................................... 27

*Von Friewalde v. Boeing Aero Operations, Inc.*,
　　339 F. App'x 448 (5th Cir. 2009) ........................................................................................ 19

*Whaley v. Henry Ford Health Sys.*,
　　172 F. Supp. 3d 994 (E.D. Mich. 2016) ......................................................................... 25, 28

*White v. Baptist Mem'l Health Care Corp.*,
　　699 F.3d 869 (6th Cir. 2012) ............................................................................................... 22

*Wolford v. Allegheny Tech., Inc.*,
　　No. 2:19- 00251, 2019 U.S. Dist. LEXIS 202140 (W.D. Pa. Nov. 21, 2019) ....................... 27

**Statutes**

29 U.S.C. § 207(a)(1) ....................................................................................................................... 30

29 U.S.C. § 207(h)(2) ....................................................................................................................... 29

29 U.S.C. § 254 ................................................................................................................................ 27

29 U.S.C. § 254(a)(2) ....................................................................................................................... 24

29 U.S.C. § 254(d) ........................................................................................................................... 23

**Court Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................................... 17

**Other Authorities**

29 C.F.R. § 785.19 ...........................................................................................................30, 31

29 C.F.R. § 785.47 ...........................................................................................................22, 23

29 C.F.R. § 790.7(f)(g) ...........................................................................................................25

29 C.F.R. § 790.8(a) ...........................................................................................................25

29 C.F.R. § 790.8(b)(c) ...........................................................................................................25

U.S. DOL Field Op. Handbook, 31b23 ...........................................................................31

# I.    **INTRODUCTION**

This case stems from changes made by Post Foods, LLC ("Post") to the uniform policy at its Battle Creek plant in May 2019, requiring employees to change into uniforms at the plant rather than at home. Plaintiffs refer to this policy as the Captive Uniform Policy or "CUP." In their First Amended Complaint ("FAC"), Plaintiffs allege Post failed to pay overtime under Section 207 of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA") for time they claim is work time (i.e., changing clothes, washing their hands, and walking to their workstations) after May 2019 due to the CUP. (ECF No. 21.) Yet these changes were the subject of collective bargaining in 2015-2016 and 2020. Despite having *twice* horse-traded this time for additional compensation, Plaintiffs now seek to obtain via litigation what they could not obtain in bargaining.[1] Plaintiffs' claims fail for several reasons.

First, Plaintiffs' claims are barred by Section 203(o) of the FLSA ("Section 203(o)"), which permits employers and unions to agree on the compensability of time spent changing clothes and washing. Plaintiffs are union members subject to collective bargaining agreements ("CBA") with Post. Since 2016, these CBAs have excluded time spent "changing clothes" from compensable time. And Plaintiffs' wash-time claim is non-compensable under the custom or practice prong of Section 203(o). Indeed, in 2019, an arbitrator found all of Plaintiffs claims for compensation for the times at issue here excluded under the 2015-16 CBA – the relevant provision of which was *readopted* in the 2020 CBA. Yet beyond donning uniforms, many employees (trucks and grounds and warehouse workers) are not required to wash or don anything except nominal items that take seconds to put on. (i.e., bump cap, safety glasses, and hearing protection).

---

[1] *Hoover v. Wyandotte Chem. Corp.,* 455 F.2d 387, 389 (5th Cir. 1972) (What a union failed to achieve though collective bargaining would not be delivered under the FLSA.); *In re Tyson Foods, Inc.*, 694 F. Supp. 2d 1358, 20 (M.D. Ga. 2010).

Second, Plaintiffs' claims for time spent walking to/from the locker room to the plant floor are not compensable under the Portal-to-Portal Act, 29 U.S.C. § 254(a)(1-2) ("PPA"). Rather, these activities are preliminary/postliminary activities not "integral and indispensable" to Plaintiffs' principal activities – they are part of the plant ingress/egress process. And Plaintiffs' uniforms, cargo pants and a shirt, are not protective equipment and are not integral and indispensable to Plaintiffs' jobs. Instead, they are virtually unchanged from the uniforms (jeans and a t-shirt) Post employees have worn for nearly 70 years. Because changing into a Post uniform and donning nominal safety equipment are not integral and indispensable, they are not compensable.

Third, even if this time was not excluded under Section 203(o) or the PPA, the time is excluded by the *de minimis* doctrine because the tasks take seconds to perform and are impossible to account for given the industrial realities of Post's plant.

Fourth, none of the activities start the continuous workday. The continuous workday does not begin until an employee has performed their first principal activity – that is, the first task that is integral and indispensable to the **<u>productive work</u>** the employee performs. Here, Plaintiffs repair electrical and mechanical equipment, maintain the exterior grounds, work in the lab, and on the production floor. Yet the tasks complained of are not tied to that  productive work.

Finally, even if the time were compensable (it is not), any time spent performing these activities must be offset against Plaintiffs' paid meal breaks. Indeed, Post employees get at least one twenty-minute meal break per shift, plus reasonable travel time. This meal break was negotiated under several CBAs and is not "work" under the FLSA. And the time spent after donning uniforms or other items does not exceed the paid meal break. Thus, once meal breaks are offset, no additional overtime would be due.

For these reasons, this Court should grant Post's Motion for Summary Judgment and dismiss Plaintiffs' Amended Complaint with prejudice.

## II.   <u>STATEMENT OF FACTS</u>

### A.   **Background**

Post was founded in 1895. Ex. 1, Clancy Dec., ¶3. It operates a cereal plant in Battle Creek that sits on about 65 acres, and houses around forty buildings and a distribution warehouse called the Materials Handling Center ("MHC"). Ex. 1, Clancy Dec., ¶4; Ex. 13(A) Clancy Dep., pp.107-108. A plant diagram is attached as Exhibit 1(A). Around 600 employees work at the plant. Of these, about 100 are salaried; the rest hourly. Ex. 1, Clancy Dec., ¶5.

Local 374 of the United Cereal, Bakery, and Food Workers of the Retail, Wholesale, and Department Store Union, UFCW ("Union") represents Post's hourly workers and Plaintiffs are/were members of the Union. Ex. 1, Clancy Dec., ¶¶5-6.[2] The Union negotiated in 2015-16 and 2020 over the 2016 and 2020 CBAs. The CBAs establish pay, benefits, overtime, and working conditions. *Id,* at Ex.(B)(C); Ex. 4, Hunt Dep., pp.45-46.[3]

At the heart of Plaintiffs' claims is the CUP. The CUP was implemented in May 2019 and requires employees to change into uniforms at work. Ex. 1, Clancy Dec., ¶23. Under the related Good Manufacturing Practices ("GMP") Policy (Ex. 1(J)(K)), all employees who work in production areas,[4] not just those directly involved in handling food (hereinafter "production employees"), must sanitize their shoes, bump cap, and wash their hands at a central handwash station before entering production buildings (i.e., a "GMP position"). Both the existence of a

---

[2] *See also* ECF No. 21, PageID.62, Am. Compl., ¶13.
[3] *See also* ECF No. 21, PageID.62, Am. Compl., ¶14.
[4] Many employees who work in production areas are not directly involved in handling food. Rather, most provide ancillary support services. Ex. 1, Clancy Dec.,¶7.

uniform and the GMP practices predate the CUP implementation in May of 2019. Ex. 1, Clancy Dec. ¶¶14, 31.

**B.      Plaintiffs**

This action was initiated by the Union. Indeed, its president, Ted Hunt, despite not working overtime after the CUP (Ex. 4, Hunt Dep., pp. 226-32), solicited Plaintiffs to file it, and the union initially financed it. *Id.* at pp.16-18, 33, 69-70.[5]

Plaintiffs are:

- **Keith Howard** is a "Class A Electrician" assigned to the mechanical department and works in building 20/32. This is a GMP position. Howard is the Top Committee Person/Trustee on the Executive Board of the Union. Ex. 1, Clancy Dec., ¶12; Ex. 8, Howard Dep., pp.5, 7-10.

- **Archie Smith** is a former "Class A Mechanic," which is a GMP position. He was the Top Committee Person/Trustee on the Executive Board of the Union and was on the bargaining committee for the 2020 CBA. Ex. 1, Clancy Dec., ¶12; Ex. 9, Smith Dep., pp.6-7, 9-11.

- **Stephanie Banks** holds the position of "A2 Reels" in building 32, which is a GMP position. Banks was the Recording Secretary of the Executive Board of the Union and was on the bargaining committee for the 2020 CBA. Ex. 1, Clancy Dec., ¶12; Ex. 12, Banks Dep., pp.10-12.

- **Kevin Jackson** holds the position of "A4 Production" in building 17. He was a Union Steward and is now a Top Committee Person on the Executive Board of the Union. This is a GMP position. Ex. 1, Clancy Dec., ¶12; Ex. 7, Jackson Dep., p.15, 90-91.

- **Jerry Panczyk** holds the position of "A5 Blending Operator" in building 17. This is a GMP position. Ex. 1, Clancy Dec., ¶12; Ex. 10, Panczyk Dep., p.11.

- **Marianne Green (f/k/a Heikkila)** holds the position of "MHC Operator" in 37 building, which is a non-GMP position. Green was a Trustee on the Executive Board of the Union. Ex. 1, Clancy Dec., ¶12; Ex. 5, Green Dep., pp.4-6, 87-89.

---

[5] *See also* Ex. 9, Smith Dep., pp.74-75; Ex. 10, Panczyk Dep., pp.61-62; Ex. 11, Tendzieloski Dep., pp.56, 58-59; Ex. 12, Banks Dep., pp.128-136.

- **Terry Greenfield** held the position of "Grounds 31" in the MHC, which is a non-GMP position. Greenfield retired from Post on December 1, 2021. He was a union steward for 25 years. Ex. 1, Clancy Dec., ¶12; Ex. 6, Greenfield Dep., pp.7-9.

- **Autumn Tendzieloski** is a "QA Technician" in the manufacturing department. Because this is a lab position, Tendzieloski is not required to undergo the GMP process before starting work, but she does wear a uniform. Ex. 1, Clancy Dec., ¶12; Ex. 11, Tendzieloski Dep., pp.8, 12-13.

In the FAC, Plaintiffs allege Post failed to pay for time spent "changing clothes." ECF No. 1, PageID.11, Compl., ¶41. Plaintiffs also allege that time spent sanitizing, washing hands, waiting in line to sanitize or wash hands, and walking to/from their workstations is compensable, arguing that these activities are not "changing clothes" under the FLSA. *Id.* Although Plaintiffs amended their Complaint, the factual allegations remain unchanged. ECF No. 21, Am. Compl., ¶¶45-49.[6] Since this action was filed, about 423 union members have opted-in. ECF No. 56, PageID.798. The opt-ins hold various production, skilled trade, and non-production positions, including bran and grain tank operators, janitors, material handlers, truck drivers, warehouse operators, and many more as identified in Appendices A & B of the CBAs. *See e.g.*, Ex. 12, Banks Dep. pp.35-38. Many do not work in production buildings. Ex. 1, Clancy Dec., ¶14.

## C.    Uniforms Before Implementation of the CUP

Since the 1950s, Post employees have worn uniforms. Ex. 1, Clancy Dec., ¶14.[7] Historically, Post provided three sets each year. Before the CUP, the uniforms consisted of jeans, khakis, overalls (bibs), a t-shirt, and safety shoes or boots. *Id.* at ¶14. Employees could change into uniforms at the plant or at home and were not paid for this time. Ex. 13(A) Clancy., pp.69, 108.

---

[6] Plaintiffs' state law claims are dismissed (ECF Nos. 40, 50). Plaintiffs have since filed a "Notice of Additional Factual Basis for Opt-In Plaintiffs FLSA Claims." ECF No. 57. Because it is not a pleading and the court has not granted leave to file a "Second Amended Complaint," Post has moved to strike it. ECF No. 58. Thus, those claims are not addressed.

[7] *See also* Ex. 2, Arb. Trans., p. 36; Ex. 3, Hunt Stat., ¶3; Ex. 4, Hunt Dep., pp.26-28; Ex. 8, Howard Dep., pp.12-13; Ex. 9, Smith Dep., pp.12-13; Ex. 12, Banks Dep., pp.13-14; Ex. 13(A) Clancy Dep., pp.106-07, Ex. 13(C), Ford Dep., p.24.

Hourly employees agreed not to wear such uniforms outside of the Plant except immediately before or after their shift (Ex. 1(D), 2012 CBA, Art.49), but some still wore their uniform for personal activities, including shopping and farming. Ex. 1, Clancy Dec. ¶14. Because "[t]he uniform policy was very much unenforced; pretty much, show up in clean jeans and a t-shift with no buttons or pockets above the waist was the status quo," it became difficult for Post to distinguish employees from visitors, contractors, and trespassers. Ex. 3, Hunt Stat., ¶3.[8] So, Post sought to re-enforce a standardized uniform to distinguish employees from others by adopting the CUP. Ex. 1, Clancy Dec., ¶14. Post also adopted the CUP to "break the outside from the inside of the plant, to prevent the transfer of microbiological contaminants into the facility through potentially contaminated footwear and outer clothing." *Id.* at ¶14-15; Ex.1(J)(K), GMP Policy; Ex. 13(C), Ford Dep., p.8.

## D.   Entry Procedure Before Implementation of the CUP

Cereal production occurs in buildings 4, 17, 20/32, and 29. The other buildings house ancillary services. Ex. 1, Clancy Dec., ¶7. The plant runs three shifts: 7:00 am to 3:00 pm; 3:00 pm to 11:00 pm; and 11:00 pm to 7:00 am. *Id.* at ¶8. Overtime causes some employees' start/end times to vary. *Id.* Since about April 2020, Post has staggered shift times because of COVID-19. *Id.*; Ex. 4, Hunt Dep., pp.150-152; Ex. 11, Tendzieloski Dep., pp.36-37.

Before the CUP, employees entered the plant through four entrances – the main entrance, building 19, the MHC, and building 8 – and travelled through internal and external walkways to

---

[8]  *See also* Ex. 2, Arb. Trans., p.73; Ex. 4, Hunt Dep., pp.31, 72; Ex. 5, Green Dep., pp.10-11, 36; Ex. 7, Jackson Dep., pp.22,47-48; Ex. 8, Howard Dep., pp.12-15; Ex. 9, Smith Dep., pp.12-13, 23-24, 36, 38-39; Ex. 10, Panczyk Dep., pp.13-15, 91-92; Ex. 11, Tendzieloski Dep., pp. 8-10, 44, 46-47; Ex. 12, Banks Dep., pp.13-14, 20.

their time clocks. Employees were not paid for this travel time. Ex. 1, Clancy Dec., ¶28.[9] Before clocking in at the entrance to production buildings, employees would don earplugs, hair and beard nets, sanitize their shoes and bump caps (collectively "Safety Equipment"),[10] and before starting work, wash their hands. The Safety Equipment is depicted below:



Ex. 14(C), Dep. Ex. Nos. 27-32, Photos.

Putting on (and taking off) these items and washing[11] takes *seconds* and employees have never been paid for it. *Id.* at ¶30-33.[12] "[T]his… this was the situation … for many years over … multiple Collective Bargaining Agreements." Ex. 2, Arb. Trans., pp.10-12.

**E.    The CUP Negotiations In 2015-16**

In 2015-16, Post and the Union exchanged proposals over the CUP in bargaining. Ex. 4, Hunt Dep., pp.81-86. On November 19, 2015, Post proposed the CUP, stating that in the future, employees would be required to change into uniforms at work and would not be paid to do so. Ex. 1, Clancy Dec., ¶17; Ex. 1(E), Post Proposal.; Ex. 2, Arb. Trans., pp.112-15; Ex. 4, Hunt Dep.,

---

[9] *See also* Ex. 1(M); Ex. 2, Arb Trans., p.29-30; Ex. 4, Hunt Dep., p.118-25, Ex. 5, Green Dep., pp.37-40; Ex. 10, Panczyk Dep., pp. 23-24, 26-29; Ex. 13(B), Hakman Dep., pp.7-10; Ex. 13(A) Clancy Dep., p.108, Ex. 13(C), Ford Dep., pp.7-8.

[10]    MHC and non-production employees are not required to put on hairnets, beard nets, or sanitize equipment. Ex. 1, Clancy Dec., ¶ 26; Ex. 13(C), Ford Dep., pp.25-26.

[11]    The CDC recommends washing hands for 20 seconds. Available at https://www.cdc.gov/handwashing/when-how-handwashing.html (Last visited 2/1/22). That is also Post's expectation. Ex. 7, Jackson Dep., p.74, 77 (20-seconds is expectation).

[12]    *See also* ECF No. 21, ¶23; Ex.1(K); Ex. 4, Hunt Dep., pp.43-44; 135-37; Ex. 5, Green Dep., pp.13,34-35, 44-47, 49-50, 56-58; Ex. 8, Howard Dep., pp.20-24; Ex. 9, Smith Dep., pp.17-21; Ex. 10 Panczyk Dep., pp.16-22; Ex. 13(A) Clancy Dep., pp.105-08; Ex. 13(C), Ford Dep., pp.23-24.

p.83; Ex. 5, Green Dep., pp.59-61. On November 20, the Union responded, proposing members be paid ten minutes of donning time, ten minutes of doffing time, and "reasonable travel time to and from where their uniforms are stored and their work area." *Id.* at ¶18.[13] Post rejected this proposal. *Id.* at ¶19; Ex. 2, Arb. Trans., p.120.

On January 27, 2016, the Union again proposed being paid for donning and doffing and travel time, but Post rejected it. Ex. 1, Clancy Dec., ¶20; Ex, 1(H); Ex. 2, Arb Trans., pp.130, 132-35; Ex. 1(G). When the Union responded on January 28, it dropped the request. *Id.* at ¶21; Ex. 1(I); Ex. 2, Arb. Trans. pp.120, 135-36. Indeed as the Union's Vice President, Director of Collective Bargaining, and lead negotiator testified:

> Q. … You negotiated over compensability of donning and doffing and reasonable travel time and the Company rejected those proposals, and you ultimately agreed with the language that omitted that language from the current Collective Bargaining Agreement, correct?
>
> A. Yes. That language does not occur in the current Collective Bargaining Agreement.

Ex. 2, Arb. Trans., pp.136-37.

The 2016 CBA was ratified. In return, union members received a $10,000 ratification bonus. Ex. 1, Clancy Dec., ¶21.[14]

Paragraph 43.1 of the 2016 (and 2020) CBA provides:

> The Company will supply uniforms and laundry services at no cost to the employee. Uniforms must be worn by employees while at work. **Employees shall be required to change clothing on Company premises, and that time shall not be counted as time worked**. Employees may not wear or take their uniforms or any safety shoes outside of Plant security gates. This provision will be implemented at a time determined by the Company during the term of this Agreement with 30 days advance notice to the Union.

---

[13] *See also* Ex. 1(F); Ex. 2, Arb Trans., pp.116-20, 126-27; Ex. 4, Hunt Dep., p.82-86.

[14] *See also* Ex. 1(B), Art. 43.1; Ex. 4, Hunt Dep., p.88; Ex. 9, Smith Dep., pp.42-43; Ex. 11, Tendzieloski Dep., pp.48-49; Ex. 12, Banks Dep., pp.72, 82, 85-86.

Ex. 1(B)(C), Art. 43.1 (emphasis added.); Ex. 13(A) Clancy Dep., pp.65-69.

**F.      Implementation of the CUP in May 2019**

On April 11, 2019, Post notified the Union it was implementing the CUP. ECF No. 21, PageID. 63, Am. Compl. ¶¶18-19. It provided the implementation timeframe on April 26. *Id.* Post implemented the CUP between May 13 and 28, 2019. Ex. 1, Clancy Dec., ¶23; Ex. 4, Hunt Dep., p.25.

**1.      Uniforms After The CUP**

Since the CUP, there are two primary uniforms – one for non-production employees and one for employees who work in areas where production occurs. For non-production workers, the uniform is grey cargo pants and a grey t-shirt. Ex. 1, Clancy Dec., ¶26.[15]



For production employees, the uniform is blue cargo pants and a blue short-sleeve shirt, Ex. 1, Clancy Dec., ¶27, [16] and is depicted below:

---

[15] *See also* Ex. 1(P), pp.8-11; Ex. 4, Hunt Dep., pp.72-73; Ex. 5, Green Dep., Green Dep., p.11, 17-18; Ex. 12, Banks Dep., p.38.

[16] *See also* Ex. 1(P), Pics, pp.5-6; Ex. 4, Hunt Dep., p.72-73; Ex. 7, Jackson Dep., p.23; Ex. 8, Howard Dep., pp.17-18; Ex. 9, Smith Dep. pp.13-16; Ex. 10 Panczyk Dep., pp.26-30; Ex. 11, Tendzieloski Dep., pp.10-11; Ex. 12, Banks Dep., pp.14-15.



It takes no longer to don/doff uniforms at work than at home. *Id.* at ¶28; Ex. 4, Hunt Dep., pp.78-79.[17]

### 2.    The GMP Policy For Production Employees

With the CUP came a need for an efficient way for employees who work in production areas to change into uniforms and obtain their nominal Safety Equipment. Thus, on May 28, 2019, Post implemented the Battle Creek Foods Safety Procedures GMP Entry and Exit Procedures ("GMP Policy"), which was revised on July 11, 2019. Ex. 1, Clancy Dec., ¶23; Ex. 1(J)(K); Ex. 2, Arb. Trans., p.39. The GMP Policy generally applies to production employees and added no new requirements.[18] It merely streamlined where these employees change clothes, get Safety Equipment, wash their hands, and sanitize their boots and bump caps before entering the production floor. As before the CUP, production employees still don Safety Equipment, sanitize their boots, and wash their hands before entering a production area. The only difference is the *location* where employees do so – from the entrance of production buildings (pre-CUP) to a

---

[17] *See also* Ex. 8, Howard Dep., p.26; Ex. 5, Green Dep., p.33-34; Ex. 9, Smith Dep., p 26-27; Ex. 12, Banks Dep., p.21.

[18] Lab workers wash their hands and don "safety equipment" after starting their workday. Thus, this time is "on-the-clock." Ex. 11, Tendzieloski Dep., pp.25-27.

centralized handwash station (post-CUP). Ex. 1, Clancy Dec., ¶¶30-32.[19] Employees are not performing job duties while changing clothes, walking to their workstations, putting on Safety Equipment, sanitizing work shoes or washing their hands. *Id.* In fact, many employees arrive early to attend to personal business. *Id.* at ¶35; Ex. 4, Hunt Dep., pp.201-207; Ex. 5, Green Dep., p.31; Ex. 13(A), Clancy Dep., p.90-91.

### 3.     Entry After The CUP

#### i.  Production Employees

Since the CUP, production employees generally enter the plant through building 8 and go to the shoe change area next to the entrance and change into their work shoes *Id.* at ¶ 28:[20]

**Work Shoes**                                                                          **Street Shoes**



After changing shoes, employees retrieve their uniform and change. *Id.*[21] After changing, they walk to a central handwash station where, if they have not already done so, they don Safety

---

[19] *See also* Ex. 1(J); Ex. 3, Hunt Stat., ¶3, Ex. 4, Hunt Dep., pp.44-45, 114-18; Ex. 5, Green Dep., pp.57-58; Ex. 9, Smith Dep., pp.37-38; Ex. 10 Panczyk Dep., pp.16-20, 30-33; Ex. 11, Tendzieloski Dep., pp.20-21; Ex. 12, Banks Dep., pp.38-44, 65, 78-79; Ex. 13(A), Clancy Dep., pp. 105-08; Ex. 13(B), Hakman Dep., pp. 21-22; Ex. 13(C), Ford Dep., pp.15-16, 23-25.
[20] *See also* Ex. 1(P), Pics., pp.1-4, Ex. 4, Hunt Dep., pp.118-24; Ex. 8, Howard Dep., pp.40-41; Ex. 10 Panczyk Dep., pp. 24, 26-29; Ex. 13(C), Ford Dep., pp.9-10; Ex. 1(J)(K), §II(A)(3-6).
[21] *See also* Ex. 2, Arb. Trans., pp.73-74; Ex. 10, Panczyk Dep., pp.28-29; Ex. 13(C), Ford Dep., p.10.

Equipment (although earplugs and safety glasses only need to be worn when in a production area). *Id.,* at ¶32; Ex. 1(J)(K), Section II(A)(16).[22] They also sanitize their shoes by stepping on a machine that sprays sanitizer on the soles of their shoes. To sanitize their bump cap and hardhats, employees spray sanitizing solution from a spray bottle and wipe it off. *Id.* Indeed, donning these items takes seconds. *Id* at ¶33.[23]

**Sinks**        **Hair/Beard Nets**        **Bump Cap Sanitizer**



**Shoe/Boot Sanitizer**

---

[22] For instance, Banks put on her hairnet in the locker room. Ex. 12, Banks Dep., pp.26, 30-31.
[23] *See also* Ex. 1(P)(1)(, p.13-15; Ex. 2, Arb. Trans., pp.45-46; Ex. 5, Green Dep., p.101, Ex. 10 Panczyk Dep., pp.29-33; Ex. 12, Banks Dep., pp.29-34, Ex. 13(B), Hakman Dep., pp. 21-22; Ex. 13(C), Ford Dep., pp.11-15.

**Hair/Beard Nets**                                                          **Hearing Protection**



Ex. 1(P)(pp.13-15).

Next, production employees travel via interior walkways to production buildings. The travel patterns before and after the CUP are shown in Exhibit 1(M). Any additional travel time is because the entrance was moved to building 8. Ex. 3, Hunt Stat., ¶¶4-5.[24] The current travel path for production area employees is:



**Production Building**       **GMP Station**    **Plant Entrance**       **Production Building**
**Bldg. 4 & 20/32**                              **Bldg. 8**              **Bldg. 17 & 29**

*See* Ex. 1, Clancy Dec., ¶30, Ex. 1(L).

Overall, it takes between three to five minutes to walk from the locker room in Building 8, including the time spent washing hands and donning Safety Equipment, to the various production

---

[24] One Plaintiff has characterized the walk as unchanged. Ex. 11, Tendzieloski Dep., p.19.

buildings where the time clocks are located. *Id*. at ¶34; Ex. 13(A), Clancy Dep., pp.103-04; Ex. 13(B), Hakman Dep., pp.10-11, 18-19. As has been long-time practice, employees are not paid for this time. Ex. 13(A) Clancy Dep., pp.69-71, 73-76.

### ii.   Non-Production Employees

Non-production employees enter the plant from the MHC or building 8. They then walk directly to their work area where they don uniforms in the locker rooms in their building. Some non-production employees clock in after changing into their uniform, but others do so before. Ex. 1, Clancy Dec., ¶26; Ex. 6, Greenfield Dep., p.20. MHC employees park in a parking lot next to the MHC and walk to the employee locker room in the MHC. There, they don their uniform and clock in. Like non-production employees, some MHC workers clock in before changing. Ex. 5, Green Dep., p.14, 30-34. MHC and non-production employees are not required to put on hairnets, beard nets, or sanitize equipment. Ex. 1, Clancy Dec., ¶26; Ex. 13(C), Ford Dep., pp.25-26.  Other than changing into their uniforms on site, nothing changed after the CUP for these employees. Ex. 2, Arb. Trans., pp.18-19; Ex. 4, Hunt Dep., pp.129-134.

### iii.   Post-Shift Duties

Employees have no post-shift duties, except to put dirty uniforms in dirty laundry bins. Ex. 1, Clancy Dec., ¶36. Even so, some wait to deposit their dirty clothes until the start of their next shift.[1] Ex. 11, Tendzieloski Dep., p.22; Ex. 13(C), Ford Dep., pp.16.

## G.      Arbitration Over the CUP

After notice of implementation of the CUP, the Union filed a grievance, alleging Post violated "Article #1, #43.1, and #43.4 and past practice of the [CBA]" and sought to have Post cease implementation. The Union also filed an Unfair Labor Practice charge ("ULP") with the National Labor Relations Board ("NLRB"), which was deferred to the arbitrator. Ex. 1(N),

Grievance ; Ex. 1, Clancy Dec., ¶37; Ex. 4, Hunt Dep., pp.54-59, 63-64; Ex. 12, Banks Dep., pp. 83-84, Ex, 14(A), Dep. Ex. 11, NLRB Claim & Deferral. The Union asked the arbitrator to find that because the company requires employees "to change clothes & travel to the job site," employees should "be reimbursed for such time as time worked." *Id.*

Arbitration took place December 13, 2019. At arbitration, Plaintiffs produced self-created "time studies" claiming production employees spend between seven minutes, six seconds and ten minutes, forty-two seconds traveling from the locker rooms to the time clock after changing clothes. Ex. 4, Hunt Dep., pp.62-64; Ex. 14(B), Dep. Ex. 11. Plt. Time Studies. Non-production workers claimed to have spent between one minute and one minute, twenty seconds after changing clothes putting on bump caps, safety glasses, and hearing protection and walking to their timeclock. *Id.* Banks, Howard, and Green, together with Hunt and other opt-ins participated in these "studies." *Id.*

Following the hearing, the arbitrator rejected the grievance, concluding that the Union had *twice* bargained over compensability of the alleged time and the time was non-compensable. Ex. 1(O), Arb. Opinion; Ex. 2, Arb. Trans., pp.145-46.[25] The union did not appeal the arbitrator's decision, the NLRB dismissed the ULP Charge, and the arbitration decision became final. *Id; see also* Ex. 1, Clancy Dec., ¶38; Ex. 4, Hunt Dep., pp.67-68.

**H.      2020 CBA**

In 2020, Post and the Union bargained over the 2020-23 CBA. On September 9, 2020, the Union specifically requested bargaining over Article 43.1. Ex. 1, Clancy Dec., ¶39; Ex. 1(Q), Bargaining Demand Ltr.; Ex. 4, Hunt Dep., pp.88-91; Ex. 5, Green Dep., pp.63-64; Ex. 9, Smith Dep., pp.44-48; Ex. 11, Tendzieloski Dep., p.60; Ex. 12, Banks Dep., pp.65, 87-89. During

---

[25] *See also* Ex. 1, Clancy Dec., ¶38; Ex. 4, Hunt Dep., pp.66-68; Ex. 12, Banks Dep., pp.86-87.

bargaining, the Union proposed that Post pay thirty minutes for donning, doffing, and travel time. *Id.* at ¶40; Ex. 4, Hunt Dep., pp.92-93, Ex. 12, Banks Dep., pp.87-89. However, in exchange for Post permitting employees to work double shifts, the Union abandoned that request. Instead, the Union traded the donning, doffing, and travel time for being able to work double shifts (i.e., additional compensation). *Id.* at ¶41. This was a substantial concession by Post and meant that employees with base yearly earnings of about $70,000 could earn around $200,000 per year. *Id*; Ex. 4, Hunt Dep., pp.94-98; Ex. 5, Green Dep., pp. 63-65, 112-13; Ex. 12, Banks Dep., p.88; Ex. 8, Howard Dep., pp.50-55. The membership ratified the 2020 CBA without changes to Article 43.1. *Id.*[26] Non-mechanical employees received a $2,000 ratification/retro payment, and mechanical employees received a $500 retro wage payment and a 1.5% raise. *Id.*

## I.      Pay and Overtime

Pay and overtime is governed by the CBA. Under both the 2016 and 2020 CBAs, employees are paid based on rates in Appendices A and B of the CBAs. *Id.* at ¶42; Ex. 1(B)(C); Ex. 13(A) Clancy Dep., pp.84-85. Pay is based on shift start and end times unless employees work overtime. While employees can clock in fifteen minutes before the start of their shift, they do not begin work until their shift starts, unless they are working overtime. Ex. 4, Hunt Dep., pp.102-04.[27] This is because unless an absence occurs, employees generally replace or are replaced by other employees performing the same job but on a separate shift. Ex. 1, Clancy Dec., ¶¶43-44.

Under the CBAs, employees earn overtime when they work more than eight hours per day *or* forty hours in a workweek. Ex. 1, Clancy Dec., ¶ 45. Additionally, employees who work all their scheduled hours receive one and one-half times their straight-time rate if they work Saturdays,

---

[26] *See also* Ex. 4, Hunt Dep., pp.98-100; Ex. 10 Panczyk Dep., p.67; Ex. 11, Tendzieloski Dep., pp.64, 67; Ex. 12, pp.89-90.

[27] *See also* Ex. 9, Smith Dep., pp.30-32; Ex. 12, Banks Dep., pp.77-78; Ex. 13(A) Clancy Dep., pp.81-83, 90-91, 104-05.

even if that time is not FLSA overtime. *Id.* If they work Sundays, they receive double-time provided they worked or had excused absences in the workweek. *Id* at ¶46.[28] Thus, employees earn overtime and/or double-time in workweeks where they work less than forty hours. *Id.*[29] Like many unionized workforces, there are extensive provisions about overtime in the CBA. *Id.*

Meal and rest breaks are also governed by the CBA. During each shift, employees have one twenty-minute meal period "with pay" and two ten-minute paid break periods. *Id.* at ¶47.[30] If the employee works twelve consecutive hours, they receive an additional ten-minute rest break and a second twenty-minute meal period. *Id.* All breaks include "reasonable travel time" (described as about five minutes each way). *Id.* Employees generally take all breaks and, if there is an issue, there is a process to address it. *Id.* Employees generally perform no work on breaks and have sufficient time to eat during their meal period. *Id.*

## III.     ARGUMENT

### A.     Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether there is a genuine dispute of material fact. *Holbrook v.*

---

[28] *See also* Ex. 1(B)(C), CBAs, Art. 44; Ex. 4, Hunt Dep., pp.217-23; Ex. 8, Howard Dep., p.49; Ex. 10 Panczyk Dep., p.72; Ex. 12, Banks Dep., pp.101-06; Ex. 13(A) Clancy Dep., pp.99-100.

[29] *See also* Ex. 1(B)(C), CBAs, Art. 44; Ex. 1(B)(C) Art. 2, §45; Ex. 4, Hunt Dep., pp.212-15; Ex. 8, Howard Dep., pp.42-43; Ex. 9, Smith Dep., pp.8-9, 53-56, 79-80; Ex. 11, Tendzieloski Dep., pp.77-83; Ex. 12, Banks Dep., pp.120-22; Ex. 13(A) Clancy Dep., pp. 85-88.

[30] *See also* Exs. 1(A)(B), Arts. 37, 37.1-37.2, 37.5; Ex. 4, Hunt Dep., pp.45-47, 107-08, 112-14; Ex. 5, Green Dep., pp. 73-77; Ex. 6, Greenfield Dep., pp.29-30; Ex. 7, Jackson Dep., pp.85-88; Ex. 8, Howard Dep., pp.46-47, 110-11; Ex. 9, Smith Dep., p.50-52; Ex. 10 Panczyk Dep., p.54; Ex. 11, Tendzieloski  Dep., pp.74-76; Ex. 12, Banks Dep., p.106-111; Ex. 13(A) Clancy Dep., pp.92-99.

*Prodomax Automation Ltd.*, No. 1-17-219, 2020 U.S. Dist. LEXIS 207134, at \*5-6 (W.D. Mich. Nov. 5, 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986) (quoting Fed. R. Civ. P 56(c)). A material fact is only genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.      Plaintiffs' Donning and Doffing Claims Are Precluded By § 203(o) of the FLSA.**

Section 203(o) provides:

> In determining for the purposes of sections 206 and 207 of this title the hours for which an employee is employed, there shall be excluded **any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the <u>express terms of or by custom or practice under a bona fide collective-bargaining agreement</u>** applicable to the particular employee. [Emphasis added.]

Section 203(o) is an "exclusion from the definition of work." *Auxer v. Republic Waste Servs. of Ohio Hauling, LLC*, No. 2:18-212, 2019 U.S. Dist. LEXIS 44404, at \*4 (S.D. Ohio Mar. 19, 2019) (citing *Franklin v. Kellogg Co.*, 619 F.3d 604, 611-12 (6th Cir. 2010)). Thus, "plaintiff bears the burden to prove that the time should not be excluded under Section 203(o)." *Id.*

In *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014), the Supreme Court reaffirmed that parties may collectively bargain over whether time spent changing clothes and washing is compensable. The Court held that unionized employees' "donning and doffing of the protective gear"—gear that included items such as a "flame-retardant jacket," a "hardhat," "work gloves," "leggings," a "pair of pants," and "metatarsal boots"— "qualifie[d] as 'changing clothes' within

the meaning of §203(o)." *Id.* at 232-33.[31]

The *Sandifer* Court rejected a narrow interpretation of "time spent in changing clothes or washing" and applied a practical test to evaluate the compensability of time spent donning and doffing non-clothes. *Id.* at 235. The Court held that if the donning and doffing time "*on the whole*" is "time spent changing clothes or washing" under section 203(o), then time changing in and out of non-clothing protective equipment is *not* compensable. *Id.* at 235 (emphasis in original);[32] *see also Mitchell v. JCG Indus., Inc.*, 745 F.3d. 837, 839 (7th Cir. 2014) (changing time for poultry plant employees not compensable at the start/end of the workday or before/after meal breaks). Thus, to be compensable, protective equipment must be sufficiently different from ordinary protective equipment. However, courts have found all manner of less-than-everyday clothing to be "ordinary" under Section 203(o). *Auxer,* 2019 U.S. Dist. LEXIS 44404, at *5-6.[33] Even so,

_____

[31] In denying Post's Motion to Dismiss, this Court held:

> Here, Plaintiffs allege that "the vast majority of time spent changing clothes is not spent 'changing clothes' within the meaning of the FLSA. Employees spend a significant amount of time changing into and out of items that are not 'clothes' within the meaning of the FLSA. (Am. Compl. ¶ 49.) This allegation is somewhat vague and defies common sense. It is difficult to conceive how donning earplugs and a hairnet (assuming a hairnet is not "clothes") could possibly require a significant amount of time, let alone more time than changing in and out of work shoes, a work uniform, and a bump cap. In other words, without more facts, the Court cannot draw a reasonable inference that the time spent by Plaintiffs changing into and out of their work attire falls outside the exclusion in the CBA.

ECF No. 30, PageID.255.

[32] "If an employee devotes the vast majority of the time in question to putting on and off equipment or other non-clothes items (perhaps a diver's suit and tank) the entire period would not qualify as 'time spent in changing clothes' under §203(o), even if some clothes items were donned and doffed as well. But if the vast majority of the time is spent in donning and doffing 'clothes' as we have defined that term, the entire period qualifies, and the time spent putting on and off other items need not be subtracted." *Sandifer* 571 U.S. at 235.

[33] Citing *Sandifer*, 571 U.S. at 223; *see also Franklin*, 619 F.3d at 614 ("§ 203(o) clearly applies to the uniform at issue in the case at hand. The remaining items--hair and beard nets, goggles, ear plugs, non-slip shoes, and a bump cap--are also properly construed as clothes within the meaning of § 203(o)."). Indeed, other courts have reached the same conclusion. *See Von Friewalde v. Boeing Aero Operations, Inc.*, 339 F. App'x 448, 454 (5th Cir. 2009) (obtaining

19

where an employee dons and doffs "clothes" for most of the time, "the time spent putting on and off other items need not be subtracted." *Id.*

Here, the CBA provides that time spent changing clothes is *not* time worked. Yet all items at issue are clothes. Thus, Plaintiffs must prove the activities complained of—changing into work shoes, uniforms, and Safety Equipment—fall outside the definition of "time spent in changing clothes" under Section 203(o). Yet non-production and MHC workers are only required to don clothes, a bump cap, and hearing protection. And while production employees don clothing and Safety Equipment, they are of the type routinely considered "clothes" under Section 203(o). But even if donning ear plugs and hairnets were not clothes, donning these items takes seconds, and does not predominate over the time spent changing clothes. Any contrary assertion "defies common sense." ECF No. 30, PageID.255. Thus, this time is excluded from worktime under 203(o), and Plaintiffs' claim should be dismissed.

## C. Plaintiffs' Wash Time Claims Are Precluded by the Custom or Practice Provision of Section 203(o).

Plaintiffs' wash time claims are also barred by Section 203(o) because they were bargained for and represent a long-time custom and practice of non-compensability. Indeed, "[p]arties are not required to engage in formal negotiations to create a custom or practice under a *bona fide* CBA; rather, 'a particular custom or practice can become an implied term of a labor agreement through a prolonged period of acquiescence.'" *Franklin*, 619 F.3d at 621. "Custom or practice" occurs when "employees**,** over time, make *proposals* to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required." *Nat'l Lab. Rel. v. Webcor Packaging*, 118 F.3d 1115, 1121 (6th Cir. 1997). "[T]o create a term or condition

_____

standard tool bags and donning and doffing generic safety gear such as hearing and eye protection, involves minimal time, are *de minimis* and non-compensable preliminary tasks); *Gorman v. Consol. Edison Corp.,* 488 F.3d 586, 594 (2d Cir. 2007).

of employment through past practice, the practice must be mutually accepted by both parties. Where the collective bargaining agreement is ambiguous or silent on the subject for which the past practice has developed, there need only be tacit agreement that the practice would continue." *Detroit Police Lieutenants & Sergeants Ass'n v. City of Detroit Police Dep't*, No. 12-15296, at *13 (E.D. Mich. Feb. 11, 2013). Section 203(o)'s requirement of a "custom or practice under a *bona fide* CBA" occurs "even when negotiations never included the issue of non-compensation for changing time," where "a policy of non-compensation for changing time has been in effect for a prolonged period of time" and "was in effect at the time a CBA was executed." *Franklin*, 619 F.3d at 617.[34]

Here, Plaintiffs employed in production roles have always washed their hands. Yet they have never been paid for it. When the CUP was proposed in 2015, the parties explicitly bargained over payment. But the Union agreed that this time would not be paid. *Id.* Thereafter, the question of compensation was subject to a grievance arbitration that the Union lost. [35] And when the parties

---

[34] *See also Turner v. City of Philadelphia*, 262 F.3d 222, 226 (3d Cir. 2001) (custom or practice existed when change time was not compensated for more than thirty years and every CBA between plaintiffs and defendants was silent on compensation for change time; a union president had informally mentioned the compensation during labor management meetings with defendants' representatives but the issue was never raised in formal collective bargaining); *Anderson v. Cagle's Inc.*, 488 F.3d 945, 958-59 (11th Cir. 2007) (ten-year period of non-compensation from a policy concerning non-compensation of clothes changing whether "written or unwritten" in place when a CBA was executed constituted custom or practice because "[a]bsence of negotiations cannot in this instance equate to ignorance of the policy. Rather, it demonstrates acquiescence to it"); *Allen v. McWane, Inc.*, 593 F.3d 449, 457 (5th Cir. 2010) ("as long as there was a company policy of non-compensation for time spent changing for a prolonged period of time—allowing the court to infer that the union had knowledge of and acquiesced to the employer's policy—and a CBA existed, the parties need not have explicitly discussed such compensation when negotiating the CBA" to establish a custom or practice); *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 192-95 (3d Cir. 2014) (30 years of non-compensation for donning and doffing under governing CBAs sufficient to establish custom or practice); *Jackson v. Old EPT, LLC*, 834 F.3d 872, 876 (8th Cir. 2016) ("A custom or practice under that agreement excluded time spent donning and doffing work clothing from measured working time.")

[35] The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a

bargained again in 2020, the Union "horse-traded" this time away for other compensation. Thus, the time is non-compensable under § 203(o). *Brock v. City of Cincinnati*, 236 F.3d 793, 801 (6th Cir. 2001) (employers and employees may resolve whether activity is "work" through a CBA). Thus, because the compensation sought is contrary to past practice, and it was explicitly bargained over, Plaintiffs' wash time and other claims are barred by Section 203(o) and should be dismissed.

**D.    Even If The Time At Issue Is Compensable, Which It Is Not, It Is *De Minimis*.**

The *de minimis* doctrine applies to FLSA overtime cases. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946) *overruled in part on other grounds* ("When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded ... It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."); *Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1006, 1018 (6th Cir. 2020) ("We already reject claims for compensation when they are based on activities undertaken for *de minimis* amounts of time or are too difficult in practice to record."); *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012) ("A *de minimis* rule applies when "the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours); *Brock*, 236 F.3d at 804 (the *de minimis* work doctrine enables courts to treat theoretically compensable work as non-compensable when the amount of work is negligible); 29 C.F.R. § 785.47 (the *de minimis* rule applies "where there are uncertain and indefinite periods of time involv[ing] of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities.").

---

part of the collective bargaining agreement although not expressed in it." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581-82 (1960). And when the CBA provides that arbitration is the exclusive remedy for alleged violations of the CBA, the arbitrator is the only entity empowered to craft a remedy. *UAW Int'l v. TRW Auto. U.S. LLC*, No. 19-2252, at *17 (6th Cir. Mar. 11, 2021), citing *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987) (Courts "are not authorized to reconsider the merits of an [arbitration] award.")

Employers do not violate the FLSA by failing to pay for otherwise compensable activities when the time spent is negligible. *Scalia v. AWP, Inc.*, No. 1-18- 1183, 2020 U.S. Dist. LEXIS 241258, at *55 (W.D. Mich. Dec. 23, 2020) (Jarbou, H.) ("The *de minimis* doctrine allows employers to disregard otherwise compensable work when only a few seconds or minutes of work beyond the scheduled working hours are in dispute."). When evaluating whether work is *de minimis*, courts typically consider the amount of time spent on the extra work, the practical administrative difficulties of recording additional time, the regularity with which the additional work is performed, and the aggregate amount of compensable time. *Brock*, 738 F. 3d at 804 (citing *Lindow v. U.S.*, 738 F.2d 1057, 1062-63 (9th Cir. 1984)); *see also* 29 C.F.R. § 785.47.

Most courts hold that daily periods of less than ten minutes are *de minimis*. *Lindow*, 738 F.2d at 1063. Here, the time involved is seconds. And non-production workers do not don any items that are not clothes. Indeed, *Sandifer* holds that when the "vast majority" of employees' time qualifies for a particular treatment under the Act, that treatment can be applied to the entire period. *Schaefer v. Walker Bros. Enter.*, 829 F3d 551, 555 (7th Cir. 2016) (citing *Sandifer*, 134 S. Ct. 881). And here, the vast majority (if not all time) is excludable under Section 203(o). But even if it is not, the remainder involves seconds. And it would be impossible to even determine whether the few seconds even would add additional paid time.[36] And this time is difficult to account for given that employees are paid per shift under a negotiated CBA and time clocks are in production areas. Given the nominal time and the industrial realities, the time is *de minimis.* Accordingly, Plaintiffs' claims should be dismissed.

**E.     Plaintiffs' Claims are Precluded by the Portal-to-Portal Act.**

If Plaintiffs' claims were not barred by Section 203(o), which they are, they still fail

---

[36] Where activities that are ordinarily preliminary or postliminary are compensable, only the time the employee actually engages in those activities is compensable 29 U.S.C. § 254(d).

because the time is non-compensable under the PPA. Congress enacted the PPA in response to broad judicial interpretations of the FLSA. The PPA intentionally narrowed the FLSA by excluding the following from compensable time:

> (1) Walking, riding or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform; and
>
> (2) Activities which are preliminary or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a)(1)(2); *see also Integrity Staffing,* 574 U.S. at 31-32.

The FLSA, as amended by the PPA, governs compensable work. Activities that are either preliminary or postliminary to principal activities are noncompensable unless they are "an integral and indispensable part of the principal activities for which covered workmen are employed." 29 U.S.C. § 254(a)(2); *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956).[37] The "integral" and "indispensable" requirements "are separate prongs, and both are required to transform a non-compensable preliminary/postliminary activity into a compensable principal activity." *AWP, Inc.*, 2020 U.S. Dist. LEXIS 241258, at *16 (citations omitted).

Preliminary activities include: (1) walking or riding by an employee between the plant gate and the employee's lathe, workbench, or other actual place of performance of his principal activity or activities; (2) riding on buses between a town and an outlying mine or factory where the

---

[37] "The word 'integral' means '[b]elonging to or making up an integral whole; constituent, component; spec[ifically] necessary to the completeness or integrity of the whole; forming an intrinsic portion or element, as distinguished from an adjunct or appendage.'" *Integrity Staffing,* 574 U.S. at 33 (alterations in original) (quoting 5 Oxford English Dictionary 366 (1933) (OED)). "'[I]ndispensable' means a duty '[t]hat cannot be dispensed with, remitted, set aside, disregarded, or neglected.'" *Id.* (alterations in original) (quoting 5 OED 219). "An activity is therefore integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Id.*

employee is employed; and (3) riding on buses or trains from a logging camp to a particular site at which the logging operations are actually being conducted. 29 C.F.R. §790.7(f)(g). They also include checking in and out and waiting in line to do so, changing clothes, washing up or showering, and waiting in line to receive pay checks. 29 C.F.R. §790.8(b)(c) (defining "principal activity" to include activities that are an integral part of a principal activity and indispensable to its performance); 29 C.F.R. §790.8(a) ("Principal" activities referred to in the statute are activities which the employee is "employed to perform"; they do not include non-compensable "walking, riding, or traveling" of the type referred to in Section 4 of the PPA.) As the regulations explain, "when performed under the conditions normally present," activities including "checking in and out and waiting in line to do so, changing clothes, washing up or showering, and waiting in line to receive pay checks" are "preliminary" or "postliminary" activities. *Integrity Staffing*, 574 U.S. at 35 (citing 29 C.F.R. §790.7(g)).

In *Integrity Staffing*, 574 U.S. at 33-37, the Supreme Court held "[a]n activity is therefore integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Id.* at 33.[38] *Integrity Staffing* involved workers seeking compensation for the time spent undergoing post-shift security screening. *Id.* at 35-37. Holding the time not compensable under the PPA, the Court found these activities were not "principal activity or activities which the employees were employed to perform" because the employer "did not employ its workers to undergo security screenings, but to retrieve products from warehouse

---

[38] *Integrity Staffing* represented a change in the law. *Whaley v. Henry Ford Health Sys.*, 172 F. Supp. 3d 994, 1003 (E.D. Mich. 2016). As the *Whaley* Court recognized, *Integrity Staffing* abrogated the three-prong test in *Franklin* previously used to determine whether an activity was integral and indispensable. Among other things, the *Franklin* Court's now-abrogated test involved an analysis of whether the "activity is required by the employer." *See Franklin*, 619 F.3d at 620. But the Supreme Court rejected this test. *See Integrity Staffing*, 574 U.S. at 33.

shelves and package those products for shipment to Amazon customers." *Id.* at 35. Importantly, the Court emphasized that the integral and indispensable test is tied to the *productive work* that the employee is *employed to perform*. *Id.* at 36.[39]

The Court also rejected the argument that an activity is "integral and indispensable" simply because an employer requires it. *Id.* at 36 ("If the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' the very activities that the [PPA] was designed to address."). Rather, the Court held that although required, they were "non-compensable postliminary activities" because an activity is only integral and indispensable where it is "an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities." *Id.*; *AWP, Inc.*, 2020 U.S. Dist. LEXIS 241258, at *59.

The "integral and indispensable" test is not a but-for test of casual necessity. Thus, "[t]he fact that certain pre-shift activities are necessary for employees to engage in their principal activities does not mean that those pre-shift activities are 'integral and indispensable' to a 'principal activity' under *Steiner*." *IBP* v. *Alverez,* 546 U.S 21. 40-41 (2005); *see also Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340 (11th Cir. 2007).[40] As the *Bonilla* Court explained,

---

[39] As Justice Sotomayor explained in her concurring opinion in *Integrity Staffing*, "the [PPA] is primarily concerned with defining the beginning and end of the workday. ... It distinguishes between activities that are essentially part of the ingress and egress process, on the one hand, and activities that constitute the actual 'work of consequence performed for an employer,' on the other hand. . . . The security screenings at issue here fall on the 'preliminary . . . or postliminary' side of this line. . . . The searches were part of the process by which the employees egressed their place of work, akin to checking in and out and waiting in line to do so—activities that Congress clearly deemed to be preliminary or postliminary." *Henderson v. Cuyahoga Co.*, No. 1:20 CV 1351; 2020 U.S. Dist. LEXIS 175947, at *9 (N.D. Ohio Sep. 24, 2020) (Pre-shift security screening for correctional officer not compensable even though related to duties because they could still perform his job effectively if eliminated.) (citing *Integrity Staffing*, 574 U.S. at 38-39) (Sotomayor, J. concurring).

[40] In *Bonilla*, the Eleventh Circuit concluded that time spent undergoing an FAA mandates security screening followed by a ride to the Miami Airport terminal was not integral or indispensable, concluding that "although the screening was necessary for the employees to perform their work, [the employer] did not primarily – or even particularly – benefit from the security

26

"[i]f the [PPA] is to have any meaning at all, its terms cannot be swallowed by an all-inclusive definition of "integral and indispensable."" 487 F. 3d at 1344.

Since *Integrity Staffing*, courts have routinely concluded that walks and other activities that precede an employee's performance of their principal activities are non-compensable under the PPA. *See Castaneda v. JBS USA, LLC*, 819 F.3d 1237, 1249 (10th Cir. 2016) ("walk time between the production floor and the locker room, where non-compensable donning or doffing occurs, is non-compensable under the Portal-to-Portal Act. . . even if an employee must carry equipment on the way.").[41]

Contrary to Plaintiffs' allegations, they are not employed to produce contaminant-free cereal. Rather, while some manufacture cereal, most perform ancillary tasks, such as monitoring

---

regime. Relying on *Alverez* and *Steiner*, the *Bonilla* Court affirmed that simply because pre-shift activities are necessary does not mean they are "integral and indispensable" to a "principal activity" under *Steiner*. *Bonilla* at 1344. Rather, the court concluded the screening and bus ride was simply part of ingress and egress process. The same is true here.

[41] *See also Bonds v. GMS Mine Repair & Maint., Inc.*, 2015 U.S. Dist. LEXIS 127769 (W.D. Penn. 2015) (mandatory pre-shift meetings not integral because the employer "could have eliminated the pre-shift safety meetings without impairing the miners['] ability to conduct their work."); *Vance v. Amazon.com, Inc.*, 852 F.3d 601, 609 (6th Cir. 2017); *Adair v. ConAgra Foods, Inc.*, 728 F.3d 849, 852 (8th Cir. 2013) (where the changing clothes has been reclassified as a nonprincipal activity by a CBA under § 203(o), compensation cannot begin until the next principal activity, and therefore, any travel time beforehand is excluded under § 254(a)"; *Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 596-97 (7th Cir. 2012), *cert. granted, on other grounds*, 133 S. Ct. 1240, (U.S. 2013); *Wolford v. Allegheny Tech., Inc.*, No. 2:19- 00251, 2019 U.S. Dist. LEXIS 202140, at *11 (W.D. Pa. Nov. 21, 2019) (Plaintiffs may not recover travel time between the locker room and their workstation. By operation of the CBA and 29 U.S.C. § 254, Plaintiffs' continuous workday does not begin until after the Plaintiffs' travel to their first principal activity at their respective workstation.); *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 594 (2d Cir. 2007), *cert. denied*, 553 U.S. 1093, (2008) (donning and doffing protective gear including a helmet, safety glasses, and steel-toed boots may be indispensable but are not integral to the principal employees at a nuclear power plant, even if required); *Alanis v. Tracer Indus. Mgt. Co.*, 1:13-386, 2016 U.S. Dist. LEXIS 108542, at *23-26 (E.D. Tex. July 31, 2016 (required PPE as part of a safety protocol not tied to the productive work that the employee is employed to perform); *Stuntz v. Ashland Elastomers, LLC*, No. 1:14-00173, 2019 U.S. Dist. LEXIS 46229, at *34 (E.D. Tex. Feb. 22, 2019) (donning and doffing generic PPE such as steel-toe boots, gloves, safety glasses, hard hats, and hearing protection not integral and indispensable to a principal activity.)

mills and grain tanks, performing electrical work, repairing equipment, loading trucks and containers, cutting grass and shoveling sidewalks, and performing many other jobs. *See e.g.*, Ex. 12, Banks, pp.35-37 (Union members hold a variety of jobs from handling raw ingredients to fixing equipment to loading trucks). But changing into uniforms, putting on Safety Equipment, and walking to their work location are not integral and indispensable to any principal activities. Rather, their job duties are subject to a CBA and are limited by extensive contractual provisions, including how employees obtain work. *See e.g.*, Ex. 1(B)(C), CBAs, Arts. 21, 22, 29. All tasks complained of are the type of ingress and egress procedures Congress intended to be non-compensable. *Integrity Staffing*, 574 U.S. at 35.

Even though Post requires employees working in production areas to don clean uniforms, wash their hands, and sanitize their shoes, and this assists in controlling overall contaminants in the plant, there is no evidence that Plaintiffs could not have performed their job duties without doing so. Thus, while these activities are required, that does not render them integral and indispensable to principal activities.[42] *See Integrity Staffing*, 574 U.S. at 36.[43] Nor are the uniforms the type of specialized safety equipment akin to a dive suit. Rather, they are standard clothing – cargo pants and a shirt. And although Post has required employees to change into uniforms at the plant since May 2019, for nearly 70-years prior, they were fully able to perform the identical jobs in jeans and a t-shirt worn from home. Nothing about the uniform or Safety Equipment is necessary to the employees' jobs. The Safety Equipment, which takes seconds to don, is primarily for the protection of the employee. And these generic safety items are unrelated to Plaintiffs' actual job

---

[42] *Franklin's* three-part test for whether an activity is integral and indispensable was rejected by *Integrity Staffing. Whaley*, 172 F. Supp. 3d at 1003, citing *Integrity Staffing*, 135 S. Ct. at 519.

[43] And for Plaintiffs Greenfield, Heikkila, and opt-ins who work in non-production areas and the MHC, all walk time occurs before they change clothes or don equipment.

duties. Thus, they are not "integral and indispensable" to the employee's productive work. Therefore, Plaintiffs' claims should be dismissed.

**F.      The Time Spent Donning and Doffing Does Not Start the Continuous Workday.**

Under the "continuous workday" rule, activities that take place between the first and last principal activities of the day are compensable. *Alvarez*, 546 U.S. at 28-29, 37, 40 (2005) An employee is not considered to be on duty, and the continuous workday doctrine does not apply, until the employee has performed their first principal activity of the day – that is, the first task that is integral and indispensable to the duties they were hired to perform. *Integrity Staffing*, 574 U.S. at 33. An activity is integral and indispensable only if it's "tied to the productive work that the employee is *employed to perform.*" *Integrity Staffing,* 574 U.S. at 36.[44]

For the reasons previously stated, the activities here are neither integral nor indispensable to the duties Plaintiffs were hired to perform. None are a principal activity. Thus, engaging in these activities does not start the continuous workday. Accordingly, Plaintiffs' claims are non-compensable and should be dismissed.

**G.      Post May Offset Meal Breaks Against Any Claim For Time Worked**.

Even if the time sought by Plaintiffs is compensable, (it is not) Post may offset it against Plaintiffs' meal breaks before calculating overtime. But Plaintiffs' paid meal breaks exceed any alleged overtime. Thus, they have no damages.[45]

---

[44] It was long the DOL's position that "activities covered by section 203(o) cannot be considered principal activities and do not start the workday." Thus, "[w]alking time after a 203(o) activity is therefore not compensable unless it is preceded by a principal activity. *See* FLSA Op. Ltr. 2007-2 (withdrawn by AI 2010-2).

[45] Post is also entitled to a offset for premium payments made under 29 U.S.C. 207(h)(2). Under 207(h)(2), the "[e]xtra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) [of Section 207 of the FLSA] shall be creditable toward overtime compensation payable pursuant to this section." 29 U.S.C. §207(h)(2); *Herman v. Fabri-Centers of Am.*, 308 F.3d 580, 587 (6th Cir. 2002); *Smiley v. EI DuPont De Nemours & Co.*, 839 F.3d 325, 332 (3rd Cir.

The FLSA "obligates employers to compensate employees for hours in excess of forty per week at a rate of one and one-half times the employees' regular wages." *Ruffin v. MotorCity Casino*, 775 F.3d 807, 811 (6th Cir. 2015) (citing *Christopher v. SmithKline Beecham Corp*., 132 S. Ct. 2156, 2162 (2012)); *see also* 29 U.S.C. § 207(a)(1). But *bona fide* meal periods are not compensable work time. 29 C.F.R. § 785.19; *Perez v. Timberline S., LLC*, 453 F. Supp. 3d 1068, 1070 (E.D. Mich. 2020) ("After establishing this rule, the Sixth Circuit stated that 'any ordinary commute and *bona fide* mealtime that *can be established* must not be included in determining how many hours of overtime each employee worked, although Defendants may not use the amounts paid for those otherwise noncompensable work periods as an offset against the amounts owed.'"). This is because the FLSA only requires overtime for "actual work or employment." *Sec'y of Labor v. Timberline South, LLC*, 920 F. 3d 1065, 1081-82 (6th Cir. 2019) (citing *Tenn. Coal, Iron & R. Co.*, 321 U.S. at 597). And even where there is a contract, custom, or practice to pay for time spent in such a "preliminary" or "postliminary" activity, Section 4(d) of the PPA does not transform such time into hours worked if it would not have been characterized as such under the FLSA in the first place. *Id.* (citing 29 C.F.R. § 790.7). "The general rule ... is and always has been that the FLSA does not treat ordinary home-to-job-site travel as compensable." The same is true of "bona fide meal periods." 29 C.F.R. § 785.19; *Timberline S.*, 920 F.3d at 1082 (citing *Ruffin*, 775 F.3d at 811-15 (meal breaks not compensable under the FLSA)).

Indeed, an employer may offset unpaid time against paid breaks when those breaks need not be compensated under the FLSA. *Ruffin*, *supra*, citing *Barefield v. Village of Winnetka*, 81 F.3d 704 (7th Cir. 1996) (employer could "properly offset the meal break against the compensable roll-call time worked by Plaintiffs" because the "meal periods are not compensable under the

---

2016). However, given the number of opt-ins and the limited damage discovery to date, this issue is reserved.

FLSA")); *Avery v. City of Talladega*, 24 F.3d 1337, 1347 (11th Cir. 1994) (affirming offset of a meal break against compensable pre- and post-shift time); *Bolick v. Brevard Cnty. Sheriff's Dep't*, 937 F. Supp. 1560, 1572 (M.D. Fla. 1996) ("the Department may properly offset paid meal breaks against any compensable pre- and post-shift time worked by the plaintiffs"); *Cloutier v. City of Phoenix*, 834 F. Supp. 366, 372 (M.D. Ala. 1993) (since the plaintiffs received a *bona fide* paid meal period, even after including additional fifteen-minute periods before and after work, the city properly paid them because the meal period could offset that time); *Bridges v. Amoco Polymers, Inc.*, 19 F.Supp.2d 1375 (S.D. Ga. 1997) (employee given a daily thirty-minute *bona fide* paid meal period was not entitled to more compensation for daily shift turnover activities lasting fifteen to twenty minutes).[46]

Here, Plaintiffs' normal shift is eight hours. But during each shift, employees are provided a twenty-minute meal break,[47] plus reasonable travel time. During Plaintiff's meal breaks, they are free to use this time as they wish and have sufficient time to eat a meal. Thus, the meal break predominantly benefits the Plaintiffs. As such, it is a *bona fide* meal break not included in

---

[46] *See also Castaneda*, 819 F.3d at 1253-54*, Reich v. S. New Eng. Telcomms. Corp.*, 121 F.3d 58, 65 (2d Cir. 1997) ("predominant benefit standard sensibly integrates" with developing case law, regulations, "and more importantly, with the language of the FLSA itself"); *Babcock v. Butler Cnty.*, 806 F.3d 153, 156 (3d Cir. 2015); *Roy v. City of Lexington*, 141 F.3d 533, 545 (4th Cir. 1998); *Hartsell v. Dr. Pepper Bottling Co. of Tex.*, 207 F.3d 269, 274 (5th Cir. 2000); *Ruffin*, 775 F.3d at 811; *Leahy v. City of Chicago*, 96 F.3d 228, 230 n.2 (7th Cir. 1996); *Guyton v. Tyson Foods, Inc.*, 767 F.3d 754, 763 (8th Cir. 2014); *Beasley v. Hillcrest Med. Ctr.*, 78 F. App'x 67, 69-70 (10th Cir. 2003).

[47] Ordinarily, a meal break is thirty minutes or more. 29 C.F.R. § 785.19. But special circumstances permit a shorter meal period to be deemed bona fide meal break. *Id.* The DOL instructs that these factors should be reviewed: (a) work-related interruptions to the meal period are sporadic and minimal; (b) the employees have sufficient time to eat a regular meal; (c) an agreement, such as a CBA between the employee and employer, that a meal period of less than thirty minutes is sufficient to eat a regular meal; and (d) state or local law does not require a lunch period. U.S. DOL Field Op. Handbook, 31b23. All are present here and the meal breaks include reasonable travel time, which is generally understood to at least five minutes each way. (Ex. 1, Clancy Dec., ¶ 45; Ex. 1(B)(C), Art. 37.1, 37.5.)

calculating hours worked under the FLSA. Therefore, these meal breaks must be subtracted from time worked before any additional time may be deemed overtime.

Here, employees receive a twenty-minute meal break each shift. Thus, each shift, the employee only worked seven hours and forty minutes but is paid for eight hours. Even if an additional fifteen minutes of time spent travelling to the worksite, washing hands, and donning safety equipment is added, it is still less than the paid meal break. Thus, if the time Plaintiffs spend after changing into their uniform is compensable, that time is offset by their daily paid meal breaks. Accordingly, even if changing clothes starts the continuous workday, the additional time is unrecoverable because it is less than the time offset by meal breaks. Thus, Plaintiff's claims should also be dismissed on these grounds too.

## IV. <u>CONCLUSION</u>

For these reasons, Defendant Post requests that the Court enter an order granting its Motion for Summary Judgment and dismissing Plaintiffs' Complaint in its entirety.

Respectfully submitted,

/s/ Allan S. Rubin
Allan S. Rubin (P44420)
Daniel C. Waslawski (P78037)
Elyse K. Culberson (P82132)
JACKSON LEWIS P.C.
Attorneys for Defendant
2000 Town Center, Ste. 1650
Southfield, MI 48075
(248) 936-1900
Allan.rubin@jacksonlewis.com
Daniel.Waslawski@jacksonlewis.com
Elyse.Culberson@jacksonlewis.com

Dated:  February 2, 2022

## <u>CERTIFICATE OF SERVICE</u>

On this day, February 2, 2022, the undersigned did cause to be filed the foregoing document with the Court using the CM/ECF system, which will send notice of its filing to all counsel of record.

*/s/ Allan S. Rubin*
Allan S. Rubin

## Index of Exhibits

| Exhibit No. | Description |
|---|---|
| 1. | Declaration of Caitlin Clancy |
| A. | Battle Creek Campus Diagram |
| B. | 2016 Collective Bargaining Agreement |
| C. | 2020 Collective Bargaining Agreement |
| D. | 2012 Collective Bargaining Agreement |
| E. | Company Proposals over Art. 43.1 in 2015 |
| F. | Union's Response to Post's Proposal over Art. 43.1 in 2015 |
| G. | Union's January 27, 2016 Economic Proposal |
| H. | Post's January 27, 2016 Response to Union's Economic Proposals |
| I. | Union's January 28, 2016 Response to Post Foods Economic Proposal |
| J. | May 28, 2018 Battle Creek Foods Safety Procedures- GMP Entry and Exit Procedures |
| K. | July 11, 2019 revision to the Battle Creek Foods Safety Procedures- GMP Entry and Exit Procedures |
| L. | Campus Map Markup |
| M. | Travel Pattern Maps |
| N. | April 25, 2019 Grievance |
| O. | Labor Arbitrators Opinion-December 13, 2019 |
| P. | Pictures of Plant and Unforms |
| Q | Letter Requesting Bargaining over Article 43 |
| 2. | Excepts – Transcripts of Labor Arbitration – December 13, 2019 |
| 3. | Sworn Statement of Theodore ("Ted") Hunt |
| 4. | Excepts - Deposition Transcript – Union 30(b)(6) Deponent and Individually – Ted Hunt |
| 5. | Excerpts - Deposition Transcript – Marianne Heikkila ("Green") |
| 6. | Excerpts - Deposition Transcript – Terry Greenfield |
| 7. | Excerpts - Deposition Transcript – Kevin Jackson |
| 8. | Excerpts - Deposition Transcript – Keith Howard |
| 9. | Excerpts - Transcript – Archie Smith |
| 10. | Excerpts - Transcript – Jerry Panczyk |
| 11. | Excerpts - Deposition Transcript - Autumn Tendzieloski |
| 12. | Excerpts - Transcript – Stephanie Banks |
| 13. | Excerpts - Transcript – Post Rule 30(b)(6) depositions |
| a. | Caitlin Clancy |
| b. | Aaron "Ty" Hakman |
| c. | Liane Ford |
| 14 | Selected Deposition Exhibits ("Dep. Ex. #") |

|  | A. NLRB Charge and Deferral Letter (Excerpt Dep. Ex. 11).<br>B. Plaintiff's Time Studies introduced at Arbitration (Excerpt Dep. Ex. 11)<br>C. Dep. Exs. 27-32 – Photos of Safety Equipment |
|---|---|

4869-0326-9900, v. 2