UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEITH HOWARD, et al.,

                    Plaintiffs,

                                            Case No. 1:19-cv-570

v.

                                              Hon. Hala Y. Jarbou

POST FOODS, LLC,

                    Defendant.

_____/

## <u>OPINION</u>

       This is a putative collective action asserting claims under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq.  Plaintiffs allege that their employer, Post Foods, LLC, failed to compensate them for all their overtime hours worked as required by the FLSA.  Before the Court are Post's motion to strike (ECF No. 58), Plaintiffs' motion for partial summary judgment as to liability (ECF No. 61), and Post's motions for summary judgment (ECF Nos. 64, 83).  For the reasons herein, the Court will deny Post's motion to strike, grant Post's motions for summary judgment, deny Plaintiff's motion for partial summary judgment, and dismiss the case.

## I. BACKGROUND

       The following is a summary of the facts of this case, construing the evidence in a light most favorable to Plaintiffs.

### A. The Parties

       Defendant Post Foods, LLC is a cereal manufacturer that employs hundreds of workers at its cereal manufacturing plant in Battle Creek, Michigan.  A union represents these workers.

       Plaintiffs bring this action on behalf of themselves and

> [a]ll individuals who worked at any time during and after April 2019 for Defendant
> at its plant located in Battle Creek, Michigan.

(2d Am. Compl. ¶ 34, ECF No. 74.)

Plaintiffs hold, or held, a variety of positions in different buildings at the Battle Creek plant, which consists of over 40 buildings on a 65-acre campus. (Clancy Decl. ¶ 3, ECF No. 64-1.) Plaintiff Keith Howard is an electrician who works in building 29. (*Id.* ¶ 12.) Plaintiff Archie Smith was a mechanic. (*Id.*) Plaintiff Stephanie Banks holds the position of "A2 Reels" in building 32. (*Id.*) Plaintiff Kevin Jackson is employed as "A4 Production" in building 17. (*Id.*) Jerry Panczyk is employed as "A5 Process" in building 17. (*Id.*) Plaintiff Marianne Heikkila is employed as "MHC[1] Operator" in building 37. (*Id.*) Plaintiff Terry Greenfield held the position of "Grounds 31" in the MHC building. (*Id.*) Plaintiff Autumn Tendzieloski is a "QA Technician" in a laboratory in building 14. (*Id.*)

The production of cereal occurs in buildings 4, 17, 20/32, and 29. (*Id.* ¶ 7.) The other buildings house "ancillary services," including grain storage, a powerplant, offices, and the MHC, which is a "large storage and distribution warehouse." (*Id.*) The parties refer to the employees who work in areas where production occurs as "production employees." (*See id.*; *see also* Pls.' Br. in Supp. of Mot. for Partial Summ. J. 3-4, ECF No. 62.) The remaining employees are non-production employees. Production employees are not necessarily directly involved in the production of food. They could be responsible for repairing manufacturing equipment, moving materials within production areas, packaging boxes and finished product, or providing janitorial and safety services. (*Id.*)

**B. Use of Uniforms at the Battle Creek Plant**

Much of this case centers on whether Post must pay its hourly employees for time spent donning and doffing uniforms. Post employees have worn uniforms at the Battle Creek plant since the 1950's. (Clancy Decl. ¶ 14.) Before 2019, those uniforms consisted of jeans or khakis, a t-

---

[1] MHC stands for Material Handling Center. (Clancy Decl. ¶ 4.)

shirt issued by Post, and safety shoes.  (*Id.*)  Employees could change into their uniforms at the plant, but they were not required to do so.  Some employees put their uniforms on at home before traveling to the plant.  (*Id.*)  Post has never paid its employees for time spent changing into or out of their uniforms and shoes.  (*Id.*)

### C. 2016 CBA

In 2015, while negotiating the terms of a collective bargaining agreement ("CBA") with the union, Post proposed a new uniform policy, which the parties refer to as the "captive uniform policy" or "CUP."  That policy would require employees to wear uniforms supplied by Post, and to don and doff those uniforms while at the plant.  (*See* Ex. E to Clancy Decl., ECF No. 64-2, PageID.1283.)  Employees would no longer be allowed to wear their uniforms or safety shoes outside the plant.  (*Id.*)  And as before, the time spent changing into these uniforms and shoes would "not be counted as time worked."  (*Id.*)  The main purpose of the new policy was to "prevent the transfer of microbiological contaminants into the facility, through potentially contaminated footwear and outer clothing."  (Clancy Decl. ¶ 15.)  It also helps distinguish production employees from non-production employees.  (*See id.* ¶ 16; Banks Dep. 38, ECF No. 64-16.)

At first, the union did not accept the terms of the CUP.  In November 2015, it proposed that Post pay its employees for 20 minutes of donning and doffing time, and for "reasonable travel time to and from where their required uniforms are stored and their work area[.]"  (Clancy Decl. ¶ 18; *see* Union Proposal, Ex. F. to Clancy Decl., ECF No. 64-2, PageID.1285.)  Post rejected that proposal.  (*Id.* ¶ 19.)

In January 2016, the union again proposed that Post pay for time spent donning and doffing uniforms, as well as "reasonable travel time."  (*Id.* ¶ 20; *see* Union Proposal, Ex. G to Clancy Decl., ECF No. 64-2, PageID.1289.)  Post again rejected that proposal.  (*Id.*)

Post and the union subsequently adopted Article 43.1 as part of the 2016 CBA, which provides as follows:

> Uniforms.  The Company will supply uniforms and laundry services at no cost to the employee.  Uniforms must be worn by employees while at work.  Employees shall be required to *change clothing on Company premises, and that time shall not be counted as time worked*.  Employees may not wear or take their uniforms or any safety shoes outside of Plant security gates.  This provision will be implemented at a time determined by the Company during the term of this Agreement with 30 days advance notice to the Union.

(2016 CBA, ECF No. 64-1, PageID.1078 (emphasis added).)

**D. Implementation of the CUP**

In April and May of 2019, Post implemented the new uniform policy contemplated by Article 43.1 of the CBA.  Under that policy, employees must change into their uniforms at work, according to a detailed procedure.  Post restructured the plant to incorporate this procedure.  Before the CUP, employees could enter the plant through one of four entrances.  After the CUP, their options are more limited.  As described below, the procedure for production employees is somewhat different than the procedure for non-production employees.

**1. Production Employees**

Production employees work in areas "within food contact," so they are expected to follow Good Manufacturing Practices ("GMP").  (Hakman Dep. 16, ECF No. 62-5; *see* GMP Policy (effective May 28, 2019), ECF No. 64-2, PageID.1299; GMP Policy (effective July 11, 2019), ECF No. 64-2, PageID.1306.)  Production employees must enter the plant through an entrance in building 8.  (GMP Policy.)  In that building, they retrieve and change into dedicated work shoes.  Next, they proceed to a locker room in the same building to retrieve and change into their uniforms (a blue t-shirt and a blue pair of khakis).

After changing, these employees walk to a central handwashing and footwear sanitizing station in building 14, where they put on safety equipment if they have not already done so (i.e., a

bump cap, ear plugs, hairnet, beardnet, and safety glasses; collectively, the "Safety Gear").  They sanitize their shoes by spraying them by hand or by stepping onto a machine that sprays sanitizer on them.  They also sanitize their bump cap and any other items they may be carrying into production areas (e.g., backpack, radio, tools) by wiping and/or spraying them with sanitizer.  (GMP Policy, PageID.1301, 1307; Ford Dep. 12, ECF No. 64-19.)  Next, they proceed to their work areas in the various production buildings, where they clock in for work.

At the end of their shifts, they walk back to the locker rooms in building 8 to change out of their uniforms, deposit them in laundry bins, and change their shoes.  They typically dispose of their earplugs and hairnets.  (Banks Dep. 43-44.)

### 2. Non-production Employees

Non-production employees enter the plant through the MHC or building 8.  They then walk to their work areas.  They don their uniforms (a grey t-shirt and a grey pair of khakis) in their work buildings and clock in near the locker rooms where they change.  (Clancy Decl. ¶ 26.)  Some non-production employees clock in for work before changing; others do so after.  (*Id.*)  Some non-production employees also wear a bump cap, safety glasses, and ear protection, but they are not required to wash their hands, to wear hairnets or beardnets, or to sanitize their equipment.  (*Id.*)

Post does not pay any of its employees (production or non-production) for their pre-shift time spent changing clothes, donning Safety Gear, washing, sanitizing, or walking between the plant entrances and their work areas, or for their post-shift time changing out of the uniforms and Safety Gear.

### E. 2020 CBA

Post and the union discussed Article 43.1 when negotiating a new CBA to take effect in 2020.  The union proposed that Post pay its employees an extra thirty minutes of time to cover donning, doffing, washing, and travel time between buildings before and after shifts.  (Clancy

5

Decl. ¶ 40.)  The union dropped that request after Post agreed to allow its employees to work double shifts at overtime or double-time rates.  (*Id.* ¶ 41.)  Consequently, Article 43.1 remained unchanged in the 2020 CBA.  (*See* 2020 CBA, Art. 43.1, ECF No. 64-1, PageID.1186.)

### F. Employee Pay & Breaks

Under both the 2016 and 2020 CBAs, employees represented by the union are paid hourly rates based on their shift start and end times, unless they work overtime.  (Clancy Decl. ¶ 43.) They can clock in fifteen minutes before their shifts start, but they are not paid for time before the start of their scheduled shifts.  They can earn overtime pay by working more than eight hours in a day or more than forty hours in a week.  (*Id.* ¶ 45.)

During each shift, employees receive a twenty-minute paid meal break and two ten-minute paid breaks.  (*Id.* ¶ 47.)  All breaks include "reasonable travel time" of about five minutes before and five minutes after each break.  (*Id.*)

### G. COVID Screening

In April 2020, Post launched a pre-shift COVID-19 screening program that applied to all employees. (Clancy Dep. 13-14, ECF No. 83-1.)  The month before, Michigan Governor Gretchen Whitmer had issued an executive order requiring employers with "critical infrastructure workers," such as those involved in "[f]ood and agriculture" and "[c]ritical manufacturing," to adopt social distancing and other measures to mitigate the spread of COVID-19.  (*See* Executive Order ("EO") 2020-21, ECF No. 83-12.)  Such measures included adopting policies to prevent workers from entering the premises if they have symptoms of COVID-19 or have had contact with a person known or suspected to have COVID-19.  (*Id.*)

On April 9, 2020, Governor Whitmer issued EO 2020-42, which required businesses with employees working in person to adhere to social distancing and mitigation measures recommended by the CDC.  (EO 2020-42, ECF No. 83-13.)  At that time, the CDC was recommending that

employers allow critical infrastructure workers with a potential exposure to COVID-19 to continue working so long as they remained asymptomatic, had their temperature and symptoms screened before work, wore a facemask, and practiced social distancing.  (*White House Announces New Guidance For How Critical Employees Can Return to Work*, NPR (Apr. 8, 2020), ECF No. 83-27.)

Post launched its COVID-19 screening program on April 23, 2020.  (Clancy Dep. 13-14.) That program had two components:  a wellness questionnaire and a temperature check.  (*Id.* at 14-16.)   Initially, a third party conducted the screening.   At the plant entrances, nurses asked employees questions about whether they had symptoms of COVID-19 or had been exposed to a person who has COVID-19. They also had their temperature checked with a handheld thermometer.

On August 28, 2020, Post stopped using a third party to conduct COVID-19 screenings. (Clancy Dep. 35-36.)  Instead, it provided a website where employees could complete a screening questionnaire before each shift.  (*Id.* at 36-38.)  Many employees completed this questionnaire on their personal devices.   Others completed them on one of several computer kiosks that Post installed in building 8 and the MHC.  (*Id.* at 40.)  To continue checking its employees' temperatures without nurses and thermometers, Post installed infrared cameras at the entrances.  (*Id.* at 38-40.) Employees would stand in front of the camera while it scanned for a temperature reading.  (*Id.* at 50.)

In December 2021, Post switched to a new vendor to provide the COVID-19 screenings. As before, employees could complete the screening on their personal devices or at the kiosks provided by Post.  They could also complete them on paper.  The parties dispute how long these

screenings would take.  Sometimes employees would have to wait in line for a period of time to use a kiosk.

Post does not pay its employees for time spent completing the COVID-19 screening process.

### H. Plaintiffs' Complaint

In their second amended complaint, Plaintiffs allege that the CUP and plant restructuring have "substantially increas[ed] the time an employee spends working on Defendant's premises" before their shifts begin and after it ends.  (2d Am. Compl. ¶ 28.)  In addition, the mandatory COVID-19 screenings have increased Plaintiffs' pre-shift time at the plant.  (*Id.* ¶ 31.)   Setting aside the time required to comply with the CUP and the COVID-19 screenings, these employees work at least 40 hours per week.  (*Id.* ¶¶ 29, 45.)  Accordingly, Plaintiffs contend that they are entitled to overtime compensation for the time spent complying with the CUP before and after their shifts.  That time includes the following activities:  "changing clothes"; "donning and doffing earplugs, bump caps, and hairnets"; "sanitizing"; "washing hands"; "waiting in line to wash . . . hands or sanitize"; and "walking to and from workstations post-donning."  (*Id.* ¶ 42.)  In addition, Plaintiffs contend that they are entitled to overtime compensation for time spent undergoing the pre-shift COVID-19 screenings.  (*Id.* ¶ 45.)

Post argues that it is entitled to summary judgment for Plaintiffs' claims.  Plaintiffs argue that they are entitled to partial summary judgment as to liability.

## II. Post's Motion to Strike

Plaintiffs filed a "Notice of Additional Factual Basis for Opt-In Plaintiffs' FLSA Claims." (ECF No. 57.)  The notice asserts that Post's COVID-19 screening program increased the amount of Plaintiffs' unpaid worktime.  At the time, Plaintiffs' complaint did not include any allegations about COVID-19 screenings.  In response, Post filed a motion to strike the notice as improper.

(ECF No. 58.)  However, Post's motion is now moot because Plaintiffs subsequently incorporated their additional facts about COVID-19 screenings into their second amended complaint, rendering the notice unnecessary.  Accordingly, the Court will deny Post's motion.

### III. Post's Motions for Summary Judgment

As discussed above, Plaintiffs seek compensation for the following pre-shift activities: (1) changing into uniforms and work shoes; (2) donning Safety Gear (e.g., bump cap, ear plugs, safety glasses, and hairnet or beardnet); (3) handwashing; (4) sanitizing equipment; (5) walking between the locker rooms, the handwashing station, and the timeclock near their individual workstations; and (6) undergoing the COVID-19 screening process.  Plaintiffs also seek compensation for CUP-related activities that occur after their shifts, i.e., doffing uniforms and work shoes, walking between buildings, and removing Safety Gear.

Post argues that all these activities are excluded by the Portal-to Portal Act, and that the first four are also excluded by section 203(o) of the FLSA.

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).  "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw

all reasonable inferences against the party whose motion is under consideration.'" *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021) (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

### B. CBA & Section 203(o)

The FLSA requires employers to compensate employees at one and one-half times their "regular rate" if they work over 40 hours per week.  29 U.S.C. § 207(a)(1).  The Act permits a unionized employer to exclude certain activities from work time:

> In determining . . . the hours for which an employee is employed, there shall be excluded any time spent in ***changing clothes*** or ***washing*** at the beginning or end of each workday which was excluded from measured working time during the week involved *by the express terms of or by custom or practice under a bona fide collective-bargaining agreement* applicable to the particular employee.

29 U.S.C. § 203(o) (emphasis added).

In this case, Article 43.1 of the CBAs expressly excludes "chang[ing] clothing on Company premises" from measured work time.  Accordingly, Post argues that the time that Plaintiffs spend donning and doffing their uniforms and Safety Gear is excluded by § 203(o) and the express terms of the CBA.  In addition, Post contends that there is a "custom or practice" of not paying its employees for time spent washing their hands and sanitizing equipment, so that time is also excluded under § 203(o).

Plaintiffs have the burden of proving that their work time falls outside the exclusion in § 203(o).  *Franklin v. Kellogg Co.*, 619 F.3d 604, 612 (6th Cir. 2010).

### 1. Changing Uniforms & Shoes

In *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014), the Supreme Court interpreted "clothes" in § 203(o) to denote "*items that are both designed and used to cover the body and are commonly regarded as articles of dress*."  *Sandifer*, 571 U.S. at 227 (emphasis in original).  This definition distinguishes between "clothes and wearable items that are not clothes, such as some

equipment and devices." *Id.* at 230. Thus, "a flame-retardant jacket, pair of pants, and hood; a hardhat; a snood; wristlets; work gloves; leggings; [and] metatarsal boots" would meet the definition of clothes, whereas "safety glasses" and "earplugs" would not. *Id.* at 233. The latter have a "covering function" but they are not "commonly regarded as articles of dress." *Id.*

Applying the Supreme Court's definition, Plaintiffs' uniforms, work shoes, and bump cap qualify as clothes, whereas their safety glasses and earplugs do not. A hairnet or beardnet is a closer question. [2] Because at least some of these items are clothes, the next question is whether time spent changing into and out of all of these items qualifies as "time spent changing clothes." The Supreme Court has indicated that the phrase "time spent changing clothes" is to be interpreted somewhat broadly. The Court must decide "whether the period at issue can, *on the whole*, be fairly characterized as 'time spent changing clothes[.]'" *Id.* at 235. "If an employee devotes the vast majority of the time in question to putting on and off equipment or other non-clothes items (perhaps a diver's suit and tank) the entire period would not qualify as 'time spent in changing clothes' under § 203(o), even if some clothes items were donned and doffed as well." *Id.* Conversely, "if the vast majority of the time is spent donning and doffing 'clothes' . . . the entire period qualifies, and the time spent putting on and off other items need not be subtracted." *Id.*

Here, Plaintiffs do not dispute that the majority of the time spent by production employees changing into and out of their uniforms and shoes in building 8 is time spent "changing clothes" under § 203(o) and the CBAs. (*See* Pls.' Br. in Supp. of Mot. for Partial Summ. J. 12, ECF No. 62.) Plaintiffs provide no response regarding non-production employees. Accordingly, Plaintiffs

---

[2] In *Franklin*, the Sixth Circuit concluded that a hairnet and earplugs meet the definition of "clothes" in § 203(o), but that court used a definition that predates, and is inconsistent with, the one articulated by the Supreme Court in *Sandifer*. *See Franklin*, 619 F.3d at 614.

are not entitled to any compensation for time spent changing into and out of their work uniforms and shoes.[3]

### 2. Donning Safety Gear

Post contends that the time spent donning and doffing safety glasses, ear plugs, hairnets, beardnets, and bump caps (i.e., "Safety Gear") are also excluded by the "changing clothes" provision in § 203(o) and the CBAs. As discussed above, safety glasses and earplugs are not "clothes" within the meaning of § 203(o). *See Sandifer*, 571 U.S. at 233. A bump cap meets the definition of clothes in *Sandifer*, but hairnets and beardnets arguably do not.

Post argues that, even if ear plugs, safety glasses, hairnets and beardnets are not clothing, the "vast majority" of the time spent putting on work clothes and Safety Gear is time spent "changing clothes" because it only "takes seconds" to put on the Safety Gear and this time "does not predominate over the time spent changing clothes." (Post's Br. in Supp. of Mot. for Summ. J. 20, ECF No. 64.) But as Plaintiffs point out, the problem with Post's argument is that production employees generally don their uniforms and shoes in one location (building 8) and the Safety Gear in another (building 14).[4] Consequently, *after* putting on their uniforms and work shoes but *before* putting on their Safety Gear, production employees must spend some time walking from one building to the other, which is not time spent changing clothes. Also, some of the time spent in building 14 involves handwashing and sanitizing, both of which may occur before employees finish putting on their Safety Gear. Thus, some of the overall "period at issue" is not spent putting on clothes and non-clothes items; rather, it is spent walking, washing, and sanitizing. Post does

---

[3] Plaintiffs contend that this time is nevertheless compensable because it occurs after the COVID-19 screenings, which they argue is the first principal activity of the day. That argument fails for reasons discussed in Section III.C.

[4] Plaintiffs provide no argument about non-production employees, so the Court will grant summary judgment in Post's favor as to the time spent by those employees donning and doffing Safety Equipment.

not contend that the "vast majority" of the entire period of time spent in building 8, walking from building 8 to building 14, and washing and putting on Safety Gear in building 14 is time spent changing clothes.  Instead, Post apparently asks the Court to focus on two different clothing-related segments of time divided from one another by location and by other activities and then consider them together for purposes of § 203(o).  It is not clear that the Court can do so.

In *Sandifer*, the Supreme Court referred to a *single* "period in question."  In that case, the employees put on their uniforms and safety equipment in a single location: company-provided locker rooms.  *See Sandifer v. U.S. Steel Corp.*, No. 2:07–CV–443 RM, 2009 WL 3430222, at *4 (N.D. Ind. Oct. 15, 2009).  That court was not faced with the situation here, where the "period in question" covers two different time segments in two different locations.

Nevertheless, the Court is comfortable extending *Sandifer* to this situation.  *Sandifer* plainly applies where the time period at issue involves pre-shift time spent by employees "altering dress," i.e., putting on "clothes and wearable items that are not clothes."  *Sandifer*, 571 U.S. at 230-32.  If some of those wearable items do not fall within the definition of "clothes" in § 203(o), then the Court considers whether the "vast majority" of the time is spent putting on items that meet that definition.  *Id.*  Here, the time spent by Plaintiffs putting on uniforms and boots in building 8, and the time spent putting on Safety Gear in building 14, both fall within the general category of time spent "altering dress."  If the Court were to examine the time spent in building 8 separately from the time spent in building 14, Post's liability could hinge solely on the location in which its employees performed these pre-shift tasks.  Post could be liable simply because it put the uniforms and boots (which are clearly clothes) in a different building than the Safety Gear (some of which are not clothes).  Congress could not have intended such an arbitrary result.  Indeed, some employees occasionally put on their Safety Gear in the same building as their uniforms.  (*See*

13

Banks Dep. 26, 43 (explaining that she keeps her hairnet, bump cap, earplugs, and safety glasses in her locker); *accord* Hunt Dep. 175, ECF No. 93-3; Clancy Decl. ¶ 32.)  Thus, it makes no sense to separate those time segments for purposes of § 203(o) and the CBAs.

Considering both time segments together, there is no genuine dispute that the vast majority of that time is spent putting on clothes.  Putting on earplugs, safety glasses, a hairnet and/or beardnet takes no longer than "a couple minutes."  (Panczyk Dep. 36-37, ECF No. 93-4; *see also* Hunt Dep. 43-44, ECF No. 64-8 (earplugs, safety glasses, hairnet, and beardnet each take "seconds" to put on); Heikkila Dep. 44-47, ECF No. 64-9 (same); Howard Dep. 22-24, ECF No. 68-12 (earplugs take up to 30 seconds to put on; a hairnet, and beardnet each take a few seconds); Hakman Dep. 22, ECF No. 64-18 (ear plugs and safety glasses each take a "couple seconds" to put on).)  Plaintiffs provide no evidence from which to infer that putting on these items could possibly take longer than changing one's shirt, pants, and shoes.  Thus, this time is excluded under § 203(o).

Alternatively, Post argues that any time spent putting on Safety Gear is not compensable because it is de minimis.  The "*de minimis* rule applies when 'the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours.'"  *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012) (quoting *Hill v. United States*, 751 F.2d 810, 815 (6th Cir. 1984)).  "When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded.  Split-second absurdities are not justified by the actualities of working conditions or the [FLSA]."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946).  Thus, the Court "reject[s] claims for compensation when they are based on activities undertaken for de minimis amounts of time or are too difficult in practice to record."  *Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1006, 1018 (6th Cir. 2020).

14

Factors that the Court considers include "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984) (holding that an average of seven to eight minutes of pre-shift activity was de minimis) (cited in *Brock v. City of Cincinnati*, 236 F.3d 793, 804 (6th Cir. 2001)).

Here, although the "work" at issue is regular, the amount of time to complete it is too small to be meaningful or to be administratively feasible to record, making it de minimis. Plaintiffs contend that this issue cannot be resolved at this stage because the precise amount of time is disputed. However, Plaintiffs fail to present evidence from which a jury could infer that the simple tasks involved take more than a minute or two, which is not a significant amount of time.

Plaintiffs also suggest that Post can record this time by "moving [the] timeclocks to the building entrance" (Pls.' Resp. Br. 24, ECF No. 87), but all that would do is increase the amount of time for which Plaintiffs are paid. It would not actually record the time period at issue. And it would effectively require Post to compensate Plaintiffs for activities that are excludable under § 203(o), including changing clothes and/or handwashing (see below).

Finally, Plaintiffs contend that the de minimis rule does not apply here because their workday starts before they put on their Safety Gear. Plaintiffs contend that their workday starts when they put on their uniforms because that is their first principal activity of the day. Under the "continuous workday" rule, "the 'workday' is generally defined as 'the period between the commencement and completion on the same workday of an employee's principal activity or activities.'" *IBP, Inc. v. Alvarez*, 546 U.S. 21, 28 (2005) (citing 29 C.F.R. § 790.6(b)). Plaintiffs argue that activities performed between the start and end of a workday are generally compensable regardless of whether the time spent on them is de minimis. But the Sixth Circuit's decision in

*Franklin* suggests otherwise.  There, the Court of Appeals remanded the case to the district court to determine whether "post-donning . . . walking time" was de minimis, even though the court had already concluded that donning and doffing was a principal activity.  *Franklin*, 619 F.3d at 620.

At any rate, Plaintiffs' argument that putting on their uniforms starts their workday is unsupported for the reasons discussed in Section III.C, below.  As discussed in that section, Plaintiffs have failed to provide sufficient evidence from which a reasonable jury could infer that donning and doffing their uniforms is a principal activity.

In summary, time spent donning Safety Gear is not compensable because it is de minimis and because it part of the overall time changing clothes under § 203(o).

### 3. Handwashing & Sanitizing

Section 203(o) also permits an employer to exclude "washing" from compensable time through a CBA.  The CBAs here do not expressly exclude the time Plaintiffs spend handwashing or sanitizing.  Plaintiffs contend that the vast majority of the time spent by production employees in building 14 is dedicated to handwashing and sanitizing (or waiting in line to wash and sanitize).  And they argue that this time is separable from the time spent changing clothes in building 8.  Accordingly, they argue that they are entitled to compensation for this time.

*Handwashing*. Post responds that handwashing is excluded by the "custom or practice" provision in § 203(o).  A custom or practice under a bona fide CBA may be evident through "many years of nonpayment" and knowledge by the union and its employees that the employer did not compensate for the time at issue.  *Franklin*, 619 F.3d at 616-17.  It is a "well-established principle of labor law that a particular custom or practice can become an implied term of a labor agreement through a prolonged period of acquiescence."  *Turner v. City of Phila.*, 262 F.3d 222, 226 (3d Cir. 2001).  In addition, "'a policy concerning compensation (or noncompensation, as the case may be) for [the practice], written or unwritten, *in force or effect at the time a CBA was executed* satisfies

16

§ 203(o)'s requirement of a custom or practice under a bona fide CBA.'"  *Franklin*, 619 F.3d at

617 (quoting *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 959 (11th Cir. 2007)) (quotation marks

omitted; emphasis added).  Further, "a history of bargaining" on the issue may be "evidence of a

custom or practice" insofar as it demonstrates acquiescence.  *Cagle's*, 488 F.3d at 959 (citing

*Hoover v. Wyandotte Chems. Corp.*, 455 F.2d 387, 389 (5th Cir. 1972)).

Here, there is no genuine dispute that Post has never paid its employees for washing their

hands before their shifts.  (Clancy Decl. ¶ 34; Panczyk Dep. 21-22, ECF No. 87-2 (confirming that

he has never been paid for washing his hands before work); *see* Banks Dep. 35 (testifying that she

was "always supposed to wash [her] hands before work"); Hunt Dep. 114, 116-17 (confirming

that, prior to 2019, employees washed their hands before work); *see also* Ford Dep. 23-24, ECF

No. 64-19 (confirming that "[the CUP] wasn't creating any new GMP policies, [it was] just moving

where those things took place, other than the uniform change"); Jackson Dep. 79, ECF No. 93-1

(same).)  In addition, Plaintiff Smith was a union representative involved in negotiating the 2020

CBA; he testified that the union discussed with Post the possibility of compensating employees

for time spent changing clothes, washing hands, and putting on the Safety Gear before the start of

a shift.  (Smith Dep. 45-48, ECF No. 64-13.)  In other words, the union was aware that these

activities were not being compensated, but they agreed to the terms of a CBA that did not

compensate them for this time.

Plaintiffs rely on testimony indicating that Post's employees wash their hands throughout

their shifts, and that before the CUP, they sometimes washed their hands immediately after

clocking in because the sinks were located near the timeclocks.  (*See* Hunt Dep. 116; Banks Dep.

35.)  But that testimony does not create a genuine dispute about whether Post paid its employees

for time they spent washing their hands *before* they started their shifts, which is the basis for Plaintiffs' FLSA claim.

Plaintiffs also note that the handwashing policy implemented by Post under the CUP is stricter and takes more time.  Post now expects its employees to wash their hands for at least 20 seconds, whereas before the CUP there was no minimum time requirement.  (*See* Jackson Dep. 75-77, ECF No. 87-3.)  Regardless, there is no dispute that Post's employees have washed their hands before their shifts and that Post has never paid them for it.  And even after Post implemented the CUP, the union continued to accept the status quo in the 2020 CBA.

Given the longstanding custom that Post does not pay its employees for washing their hands before their shifts, and the failure to include any such requirement into negotiated CBAs, there is no genuine dispute that there is a custom or practice under a bona fide CBA of not paying employees for this time.  Accordingly, it is excludable under § 203(o).

*Sanitizing*.  Post apparently contends that there is a longstanding custom or practice of sanitizing boots and bump caps before entering production areas, and that Post has never paid for the time spent performing these activities.  (*See* Post's Br. in Supp. of Mot. for Summ. J. 7, ECF No. 64.)  But Post does not argue that sanitizing clothing and equipment falls within the definition of "washing" in § 203(o).  And there is reason to think that it does not.  *See Arnold v. Schreiber Foods, Inc.*, 690 F. Supp. 2d 672, 686 (M.D. Tenn. 2010) (concluding that "time spent sanitizing boots does not count as 'washing' under § 203(o)" because the "vast majority of courts to address the issue have held that § 203(o) only covers time spent by an employee washing his or her body, not his or her work equipment").

At any rate, Post argues that any time spent sanitizing is de minimis.  Employees sanitize shoes by spraying them with sanitizer or stepping into a machine that sprays the sole of each shoe.

18

(Hunt Dep. 74; Heikkila Dep. 58.)  Employees sanitize bump caps and other equipment by spraying them with sanitizer and/or wiping them down.  (Ford Dep. 12.)  These tasks take very little time. (*See* Clancy Decl. ¶ 33 (putting on Safety Gear, sanitizing, *and* washing hands takes "about a minute to perform"); Hunt Dep. 76 (it takes "seconds" to sanitize a bump cap); Heikkila Dep. 57 (sanitizing a bump cap takes "two seconds or three seconds or four seconds"); Jackson Dep. 74 (sanitizing a bump cap takes "at least" ten seconds); Hunt Dep. 75, 194-95 (sanitizing a shoe involves a "step into a box, [and a] step out of the box"; it takes "a second or two" to clean a shoe); Heikkila Dep. 58 (sanitizing a shoe takes "half a second or so").)   Accordingly, time spent sanitizing is not compensable.  And that is true even when combined with the time required to don and doff the Safety Gear.

### C. Portal-to-Portal Act

Post also argues that the pre-shift and post-shift activities identified by Plaintiffs are not compensable due to the Portal-to-Portal Act (PPA), 29 U.S.C. § 254(a).  That Act exempts the following activities from those that are compensable under the FLSA:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities. . . .

29 U.S.C. § 254(a).

In other words, the PPA exempts work-related activities that are "preliminary" or "postliminary" to the "principal activity or activities" which the employee is "employed to perform."  *Id.*  Thus, the time spent by Plaintiffs changing clothes, washing, sanitizing, walking from one building to another, completing COVID-19 screenings, and waiting in line before they

clock in for work (or after they clock out) are not compensable if they are "preliminary" or "postliminary" to their "principal activities." *Id.* This analysis requires the Court to determine Plaintiffs' principal activities.

There is no genuine dispute that Plaintiffs' principal work is not changing clothes, washing, sanitizing, walking from one building to another, waiting in line before they clock in for work, or undergoing COVID-19 screenings. These are all preparatory activities that precede their productive work at the plant. Nevertheless, "[t]he term 'principal activity or activities' in [the PPA] embraces all activities which are 'an *integral and indispensable part* of the principal activities[.]'" *Steiner v. Mitchell*, 350 U.S. 247, 252 (1956) (emphasis added). Consequently, Plaintiffs' "principal activities" under the PPA can also include "activities performed either before or after the regular work shift, on or off the production line . . . if those activities are an integral and indispensable part of the principal activities for which covered [employees] are employed and are not specifically excluded by Section 4(a)(1)." *Id.* at 256.

In other words, Plaintiffs' "principal activities" might include donning, doffing, sanitizing their work garb, or undergoing COVID-19 screenings, if those activities are "an intrinsic element of [their production] activities and one[s] with which the employee[s] cannot dispense if [they are] to perform [their] principal activities." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014). In *Steiner*, for instance, the Supreme Court held that, for employees working in a battery manufacturing facility, donning and doffing protective gear was a principal activity because it was necessary for the nature of the work that they performed in the factory. *Id.* at 252. Similarly, in *IBP*, the Supreme Court affirmed the trial court's conclusion that donning and doffing "unique protective gear" by employees cutting and bagging meat was a principal activity. *IBP*, 546 U.S. at 32. Also, in *Mitchell v. King Packing Co.*, 350 U.S. 260 (1956), that Court concluded that time

meatpacker employees spent sharpening their knives was compensable because dull knives could "slow down production," "affect the appearance of the meat as well as the quality of the hides," "cause waste," and lead to "accidents." *Id.* at 262.

Here, Plaintiffs fail to identify their principal work activities, even though it is clear that they hold different positions with different responsibilities carried out in different locations. Some handle raw ingredients, whereas others carry packaged materials. (*See* Banks Dep. 35-36.) Some operate machinery while others are responsible for fixing it. (*Id.*) Production employees work in areas where food is produced; other employees do not. Indeed, even the pre-shift activities at issue in Plaintiffs' FLSA claim differ in significant respects from one employee to another because Post requires production employees to follow procedures that it does not require for other employees.

Plaintiffs apparently argue that they all perform the same principal activity, which is "producing uncontaminated cereal." (Pls.' Resp. to Mot. for Summ. J. 2, ECF No. 87.) But that description is far too broad here. It merely describes an overall objective of their employer. It does not describe the particular "activities" that each Plaintiff, in his or her respective position, is "employed to perform." *See Integrity Staffing*, 574 U.S. at 519.

Compare Plaintiffs' description of their principal activity with the one in *Integrity Staffing*. There, the Supreme Court considered whether security screenings were an integral and indispensable part of the work of warehouse employees. The Court described the productive work of those employees as "retriev[ing] products from the shelves and packag[ing] those products for delivery to Amazon customers." *Id.* at 518. That description identifies specific activities performed by the employees. In contrast, Plaintiffs' description provides no meaningful insight into what they actually do during the workday. Consequently, it is not possible to determine

whether any of the pre-shift activities at issue in this case are an "integral and indispensable" part of Plaintiffs' productive work.

The Supreme Court's decision in *Steiner* is also unhelpful for Plaintiffs.  That case involved employees working in a battery manufacturing plant who had to change into protective gear at the start of their shift and shower at the end of their shift.  *Steiner*, 350 U.S. at 248.  Although the Supreme Court described their principal activity somewhat broadly as "the production of batteries," it also made clear that all the employees in that case were similarly situated; they "customarily work[ed] with or near the various [toxic] chemicals used in the plant," such that changing clothes and showering were necessary for protecting their health and safety.  *Id.* at 249-52.  In contrast, Plaintiffs have not offered evidence that each (or any) of their jobs involves such close contact with food that their pre-shift activities are integral and indispensable to their productive work.  The fact that production employees work in an area where food is produced does not, without more, suffice to establish that their pre-shift activities are integral and indispensable to their work.

Plaintiffs rely on *Franklin*, in which the Court of Appeals concluded that, for employees working at a frozen breakfast foods manufacturing facility, donning uniforms and protective equipment (i.e., hair nets, beard nets, safety glasses, ear plugs, and bump caps) at the start of a workday was integral and indispensable to their work.  *Franklin*, 619 F.3d at 620. The court reasoned as follows:

> First, the activity is required by Kellogg.  Second, wearing the uniform and equipment primarily benefits Kellogg.  Certainly, the employees receive protection from physical harm by wearing the equipment.  However, the benefit is primarily for Kellogg, because the uniform and equipment ensures sanitary working conditions and untainted products.  Because Franklin would be able to physically complete her job without donning the uniform and equipment, unlike the plaintiffs in *Steiner*, it is difficult to say that donning the items are *necessary* for her to perform her duties.  Nonetheless, considering these three factors, we conclude that

22

donning and doffing the uniform and standard equipment at issue here is a principal activity.

*Franklin*, 619 F.3d at 620.

The reasoning in *Franklin* is flawed because, several years after that case, the Supreme Court expressly stated that a court should not focus on whether an employer *required* a particular activity or whether the activity is performed *for the benefit of the employer. See Integrity Staffing*, 574 U.S. at 36 ("The Court of Appeals erred by focusing on whether an employer *required* a particular activity. . . .  [And a] test that turns on whether the activity is for the benefit of the employer is similarly overbroad.").  Instead, "[t]he integral and indispensable test is tied to the productive work that the employee is *employed to perform*." *Id.* (emphasis in original).  In other words, the Court must consider "the employees' duties" and determine whether their pre-shift tasks are "an intrinsic element" of their productive work "and one with which the employee[s] cannot dispense if [they are] to perform [that work]." *Id.* at 35.  Plaintiffs have not provided a description of their duties, which leaves the Court to speculate whether their pre-shift activities are, in fact, integral and indispensable to the work that Post hired each of them to perform.

Plaintiffs rest their case on the fact that a sanitary environment is important in a cereal manufacturing facility.  There is no genuine dispute that the primary purpose of the CUP and associated washing procedures is to minimize contamination of the cereal produced at Post's plant. Nevertheless, Plaintiffs' evidence requires the Court to guess whether those procedures are integral and indispensable for the work of any particular plaintiff.  The extent to which they are important for an electrician working in a production building may be very different than the extent to which they are important for an employee working in the laboratory, for an MHC operator working in the MHC building, or for positions that Plaintiffs have not described, such as "A2 Reels" and "A4 Production."  In short, because Plaintiffs have failed to present and identify evidence of their

primary work activities, they have not provided a sufficient basis on which to infer that the pre-shift and post-shift activities at issue in this case were integral and indispensable to the work Post hired them to perform rather than merely preliminary or postliminary to that work.  *Cf. Forrester v. Am. Sec. & Prot. Serv. LLC*, No. 21-5870, 2022 WL 1514905, at *2-3 (6th Cir. May 13, 2022) (dismissing FLSA complaint where a security guard did not describe her work duties or the nature of her pre-shift work).

Plaintiffs assert that the reasoning of this Court's earlier decision denying Post's motion to dismiss should dispose of Post's motion for summary judgment.  There, the Court concluded that Plaintiffs' original complaint stated a viable FLSA claim because the Court could infer from the allegations of the complaint that "Plaintiffs' principal activity is the production of cereal, for which sanitation is important."  (1/20/2021 Op. 7, ECF No. 30.)  But what suffices to allege a plausible claim does not determine what suffices to defeat a motion for summary judgment.  When the Court ruled on Post's motion to dismiss, the Court was relying solely on the allegations of  Plaintiffs' complaint.  Consequently, the Court was not aware that Plaintiffs held different positions, many of which appear to have no direct role in the production of food.  Nor was the Court aware of the specifics of the CUP and its associated procedures.  The Court thought it plausible that employees working inside a food manufacturing facility would have direct contact with the food produced or its raw ingredients.  The Court also thought it plausible that such work would require Plaintiffs to wear uniforms that acted as a physical barrier to prevent contamination of that food, much like cleanroom suits worn by microchip technicians.  But the record here does not support those inferences.  Thus, Plaintiffs' reliance on this Court's prior opinion is misplaced.

Plaintiffs also rely on other several cases that are not binding or persuasive.  *See, e.g., Duncan-Watts v. Nestle USA, Inc.*, No. 1:19 CV 01437, 2020 WL 589042 (N.D. Ohio Feb. 5,

2020); *United Food & Com. Workers Union, Loc. 1473 v. Hormel Foods Corp.*, 876 N.W.2d 99

(Wis. 2016); *McDonald v. Kellogg Co.*, No. 08-2473-JWL, 2011 WL 6180499 (D. Kan. Dec. 13,

2011); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350 (4th Cir. 2011); *Arnold v. Schreiber Foods,*

*Inc.*, 690 F. Supp. 2d 672 (M.D. Tenn. 2010); *Johnson v. Koch Foods, Inc.*, 670 F. Supp. 2d 657

(E.D. Tenn. 2009); *Hoyt v. Ellsworth Coop. Creamery*, 579 F. Supp. 2d 1132 (W.D. Wis. 2008);

*Gatewood v. Koch Foods of Miss., LLC*, 569 F. Supp. 2d 687 (S.D. Miss. 2008).

In *Duncan-Watts*, the plaintiff alleged that she worked "in direct contact with food, food-

contact surfaces, and food packaging materials"; consequently, her job required that she wear

"sanitary clothing," "lab coats," and gloves, among other things.  *Duncan-Watts*, 2020 WL

589042, at *1.  She could not legally perform her job without this clothing and protective

equipment.  Plaintiffs have not offered similar evidence of a link between their respective job

duties and the need for the CUP and related procedures.  Indeed, in a separate opinion, the court

in *Duncan-Watts* denied the plaintiff's motion for class certification because potential opt-in

plaintiffs "provided no evidence regarding their job duties," and many of their positions "do not

involve direct contact with food, food packing, or food services."  *Duncan-Watts v. Nestle USA,*

*Inc.*, No. 1:19 CV 01437, 2020 WL 589041, at *3 (N.D. Ohio Feb. 5, 2020).  Consequently, the

court could not ascertain whether donning and doffing clothing and protective equipment was

integral and indispensable to the principal activities of the opt-in plaintiffs.  *Id.*  The same is true

here for Plaintiffs.

In *Hormel Foods*, the employees worked in a canning facility.  The court described the

plaintiffs' principal activities as "grind[ing] and blanch[ing]" meat, and "cook[ing] and can[ning]"

the end product.  *Hormel Foods*, 876 N.W.2d at 102.  The court concluded that donning and doffing

uniforms and safety equipment like the kind used by Plaintiffs in this case were integral and

25

indispensable to the employees' work "preparing canned food" and therefore compensable under Wisconsin law, which is similar to the FLSA. *Id.* at 109, 115. That case is distinguishable because its modest description of the employees' principal activities is more informative than what Plaintiffs have provided here.

The other cases cited by Plaintiffs—*McDonald*, *Perez*, *Arnold*, *Johnson*, *Hoyt*, and *Gatewood*—were decided before *Integrity Staffing*. In those cases, courts relied on factors that the Supreme Court has since clarified are not dispositive in determining whether pre-shift activity is integral and indispensable, such as whether the employer required or benefited from the pre-shift activity. Thus, those cases are not persuasive.

With respect to the COVID-19 screenings, Plaintiffs argue that the screenings were integral and indispensable to "Plaintiffs' production of uncontaminated cereal" in a "sanitary plant[.]" (Pls.' Resp. Br. 4, ECF No. 90.) That argument fares no better here than when offered to justify the compensability of the other pre-shift activities. It conflates the goal of Post's operations with Plaintiffs' specific duties, which Plaintiffs have not described. It requires a fact-finder to speculate whether the absence of COVID-19 symptoms is integral and indispensable to Plaintiffs' productive work.

Plaintiffs also contend that the screenings were necessary to protect the health of other employees and customers because Plaintiffs perform their work "in tight quarters with large numbers of other workers" (*id.* at 8) and because "indoor food production facilities are known to be vectors for COVID-19 outbreaks" (Pls.' Br. in Supp. of Mot. for Partial Summ. J. 18). Plaintiffs cite no evidence to support these facts.[5] Their attorneys' statements are not evidence.

---

[5] Plaintiffs cite several articles discussing the transmission of COVID-19 through frozen foods or foods produced in a "cold chain" environment. (*See* Pls.' Br. in Supp. of Mot. for Partial Summ. J. 23 n.22.) Plaintiffs do not explain how those articles apply to their workplace.

Next, Plaintiffs rely on the following guidance from the Department of Labor (DOL):

4. My employer requires all employees to take their temperature to try to screen for people who might have COVID-19 before entering the job site. Do I need to be paid for the time spent taking my temperature?

It depends, under the FLSA, your employer is required to pay you for all hours that you work, including for time before you begin your normal working hours if the task that you are required to perform is necessary for the work you do.  For many employees, undergoing a temperature check before they begin work must be paid because it is necessary for their jobs.  For example, if a nurse who performs direct patient care services at a hospital is required to check her temperature upon arrival at the hospital before her shift, the time that she spends checking her temperature upon entry to the worksite is likely compensable because such a task is necessary for her to safely and effectively perform her job during the pandemic.  In other words, the temperature check is integral and indispensable to the nurse's job.  Other laws may offer greater protections for workers, and employers must comply with all applicable federal, state, and local laws.

DOL, Wage & Hour Division, *COVID-19 and the Fair Labor Standards Act Questions and Answers*, Q&A No. 4, https://www.dol.gov/agencies/whd/flsa/pandemic#6.

Plaintiffs argue that they are like the nurse mentioned in the example above, but the Court disagrees.  A nurse "performs direct patient services."  *Id.*  In other words, nurses are hired to care for the health of others, so it makes sense to conclude that taking precautions to avoid exposing their patients to additional illnesses would be an integral part of their work.  In contrast, there is no non-speculative evidence that Plaintiffs work in close contact with others, that their productive work involves caring for the health of others, or that their job duties put them in such close contact with the food produced by Post that they would put others at risk if they exposed that food to the virus that causes COVID-19.

Next, Plaintiffs cite a DOL opinion letter which states:

Generally, whenever an employer imposes special requirements or conditions that an employee must meet before commencing or continuing productive work, the time spent in fulfilling such special conditions is regarded as indispensable to the performance of the principal activity the employee is hired to perform. Included in this general category are required physical examinations.

> . . . It is immaterial whether the time spent in undergoing a required physical examination is during the employee's normal working hours or during nonworking hours. The physical examination and the time spent undergoing it are essential requirements of the job and thus primarily for the benefit of the employer.

DOL, Opinion Letter of the Wage & Hour Administrator (Oct 7, 1997), ECF No. 85-20.)

Plaintiffs apparently equate the COVID-19 screening process to the physical examination mentioned in the DOL letter.  However, that letter issued long before *Integrity Staffing*.  It is inconsistent with the Supreme Court's opinion because it relies on the employer's *requirement* to undergo the physical examination as well as the *benefit* to the employer from that examination. Thus, the DOL's guidance in that letter is not persuasive.

Plaintiffs also cite 29 C.F.R. § 785.43, but that provision refers to "[t]ime spent by an employee in waiting for and receiving medical attention on the premises or at the direction of the employer *during the employee's normal working hours* on days when he is working[.]"  *Id.* (emphasis added).  It does not apply to the pre-shift activities here, which do not occur during Plaintiffs' working hours.

Plaintiffs rely on *Boone v. Amazon.com Servs., LLC*, 562 F. Supp. 3d 1103 (E.D. Cal. 2022), in which a district court denied a motion to dismiss a FLSA claim seeking compensation for time spent undergoing COVID-19 screenings because the plaintiffs had "adequately alleged" that the screenings were integral and indispensable to their work as warehouse employees.  *Id.* at 1121.  Among other things, that court noted that COVID-19 screenings could be integral and indispensable to the plaintiffs' work because they alleged that the virus "rendered warehouses where hundreds of employees gather to work" akin to the "toxic" environment experienced by the battery manufacturing employees in *Steiner. Id.* at 1121. That case is distinguishable.  Unlike that court, this Court is not considering the adequacy of allegations in a complaint; rather, it is considering whether Plaintiffs have presented sufficient evidence to create a genuine dispute of

material fact for trial. Moreover, Plaintiffs have not presented evidence of a potentially "toxic" environment at their plant like that alleged in *Boone*. Plaintiffs' assertions about their work environment are unsupported.

A few other courts considering similar claims have concluded that a pre-shift COVID-19 screening is not a principal activity for non-healthcare workers. *See, e.g.*, *Adegbite v. United States*, 156 Fed. Cl. 495, 506 (2021) ("Preventing the coronavirus from getting into and/or spreading within the Institution is not integral to" the principal activities of correctional officers, who were not responsible for providing healthcare to the inmates in their facility); *Adair v. United States*, No. 20-1148C, 2021 WL 6163407, at *5 n.2 (Fed. Cl. Dec. 30, 2021) (same); *Pipich v. O'Reilly Auto Enters., LLC*, No. 21cv1120-L-LL, 2022 WL 788671, at *4 (S.D. Cal. Mar. 15, 2022) (COVID-19 screenings are not integral and indispensable to the work of a truck driver, who loaded and transported products to stores); *see also Perez v. Walmart, Inc.*, No. 4:21-cv-00120-HF, 2021 WL 5741484, at *3-4 (W.D. Mo. Oct. 25, 2021) (examining an unjust enrichment claim through the lens of *Integrity Staffing* and concluding that a COVID-19 screening was not integral and indispensable to the job of a Walmart store employee responsible for stocking and unloading products, assisting customers, and performing cashier services). Like those courts, this Court is not persuaded that COVID-19 screenings are integral and indispensable to Plaintiffs' productive work. The evidence does not suffice to make that conclusion.

Finally, Plaintiffs argue that the COVID-19 screenings were integral and indispensable because the law required them. However, Plaintiffs also acknowledge that, "[e]ven if required by law, a screening policy must still be integral and indispensable to the employees' principal activity to be compensable." (Pls.' Resp. Br. 13, ECF No. 90 (citing *Baker v. Bonilla Concrete Constr., Inc.*, 487 F.3d 1340, 1344 (11th Cir. 2007) (holding that FAA-mandated security screenings for

airport construction workers were not compensable)).)   As with their other pre-shift activities, Plaintiffs fail to show that such screenings are integral to their individual work duties as the analysis in *Integrity Staffing* requires.

In summary, Plaintiffs have failed to provide sufficient evidence from which a reasonable jury could conclude that the pre-shift and post-shift activities associated with the CUP and the COVID-19 screening program are principal activities entitled to compensation, as opposed to preliminary and postliminary activities excluded by the Portal-to-Portal Act.   And even if they could make that showing, some of those activities are excluded by § 203(o) and the de minimis rule.

### IV. Plaintiffs' Motion for Partial Summary Judgment

The Court considered Plaintiffs' arguments for summary judgment when considering Post's motions.   For the reasons described above, Post is entitled to summary judgment. Accordingly, the Court will deny Plaintiffs' motion.

### V. Conclusion

For all the foregoing reasons, the Court finds that Post is entitled to summary judgment for Plaintiffs' claims under the FLSA.   The Court will grant its motions for summary judgment and dismiss the case.

An order will enter consistent with this Opinion.

Dated: September 14, 2022                    /s/ Hala Y. Jarbou
                                             HALA Y. JARBOU
                                             CHIEF UNITED STATES DISTRICT JUDGE